George Dunbar **PREWITT, Jr.,**
Plaintiff-Appellant,

v.

**UNITED STATES POSTAL SERVICE,**
Defendant-Appellee.

No. 80–3525.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Nov. 5, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

G. Dunbar Prewitt, Jr., pro se.

William N. Reed (Court-appointed), Allan P. Bennett, Jackson, Miss., for plaintiff-appellant.

H. M. Ray, U. S. Atty., John R. Hailman, Asst. U. S. Atty., Oxford, Miss., for defendant-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

Claiming that the United States Postal Service unlawfully denied him employment due to his physical handicap, the plaintiff, George Dunbar Prewitt, Jr., brought this action against the postal service. Prewitt contended that he was physically able to perform the job for which he applied despite his handicap, even though the postal service's physical requirements indicate that only persons in "good physical condition" can perform the job because it involves "arduous" work. Prewitt alleged, inter alia, that the postal service thus violated his rights under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq. Prewitt filed this suit as a class action, after he was denied employment as a clerk/carrier at the Greenville, Mississippi post office. The district court granted the postal service's motion for summary judgment. On Prewitt's appeal, we find that the plaintiff has raised genuine issues of material fact as to 1) whether the postal service's physical requirements for postal employment are sufficiently "job related" to provide lawful grounds for the refusal to hire Prewitt, and 2) whether the postal service has breached its duty to make "reasonable accommodation" for handicapped persons such as Prewitt. Accordingly, we reverse the summary judgment of the district court, and remand the case for further proceedings in accordance with this opinion.

*The Factual Background*

The plaintiff Prewitt is a disabled Vietnam war veteran. Due to gunshot wounds, he must endure limited mobility of his left arm and shoulder. Nevertheless, in May *1970* (prior to his rejection for re-employment in 1978 that gave rise to this lawsuit), Prewitt applied for a position as a distribution clerk in the Jackson, Mississippi post office, a position which, according to the job description, "require[s] arduous physical exertion involving prolonged standing, throwing, reaching, and may involve lifting sacks of mail up to 80 pounds."[1] Prewitt was hired after passing the requisite written and medical examinations, and it is undisputed that, despite his handicap, he performed his duties in a competent, entirely satisfactory manner.

■ Prewitt resigned his position at the Jackson post office in September 1970 to return to school. He testified in his affidavit, which we must regard as true for summary judgment purposes, that his physical condition did not diminish in any significant way between May 1970 and September 1978, when he applied for the position at the Greenville post office that gave rise to this lawsuit. Prewitt questions the failure of the postal service to re-employ him in 1978, due to a physical handicap, for a position as clerk/carrier, a position with similar physical requirements to those of the job that he had satisfactorily performed in 1970.

---

1. These physical requirements of Prewitt's 1970 position as distribution clerk are similar to those for the position of clerk/carrier for which he applied in 1978. See notes 2 and 3 *infra.*

After applying for the clerk/carrier position at Greenville in 1978, Prewitt took and passed a standard written examination. He received a final rating of 92.8 (basic rating of 82.8 plus a 10 point compensable veteran's preference), which placed him second on the roster of eligible applicants. Physical suitability for the position, however, remained to be determined.

According to the postal services qualification standards, the duties of a carrier "are arduous and require that the incumbent be in good physical condition." Thus, a medical form which was given to Prewitt indicates that applicants for this position must meet a wide range of physical criteria, including, inter alia, the ability to see, hear, lift heavy weights, carry moderate weights, reach above shoulder, and use fingers and both hands.[2] According to the affidavit of Postmaster Charles Hughes, the duties of a clerk/carrier require stooping, bending, squatting, lifting up to seventy pounds, standing for long periods, stretching arms in all directions, reaching above and below the shoulder, and some twisting of the back.[3]

To determine whether Prewitt could meet these physical standards, the Greenville postal authorities asked Prewitt to authorize the Veteran's Administration (VA) to release his medical records to the postal service for examination, and Prewitt complied with this request. The VA records, which apparently were made in 1970 before

2. The form states:

> Carriers and clerks must lift up to 70 lbs. Carriers must carry satchels weighing 35 lbs. Duties require arduous exertion involving prolonged walking, standing, reaching and distribution. Ability to hear conversation voice 15 feet (aid permitted)[.] Vision 20/40 Snellen in one eye. On outside assignments this work is performed in all kinds of weather.
>
> . . . .
>
> A. FUNCTIONAL REQUIREMENTS
> [The following are indicated to be applicable]
> 1. Heavy lifting, 45 pounds and over.
> . . . .
> 5. Moderate carrying, 15–44 pounds.
> . . . .
> 10. Reaching above shoulder.
> 11. Use of fingers.
> 12. Both hands required.
> 13. Walking 8 hours.
> 14. Standing 8 hours.
> . . . .
> 21. Operation of crane truck tractor or motor vehicle.
> . . . .
> 25. Far vision correctable in one eye to 20/20 and to 20/40 in the other.
> . . . .
> 32. Hearing *aid permitted*.

3. Hughes' complete description of the job duties was as follows:

> The duties of a newly hired distribution clerk and letter carrier at the Greenville Post Office are:
>
> Meet incoming mail trucks at loading platform in the early morning to assist in off-loading sacks of mail, pouches of mail, containers of parcel post, loose parcels, etc. All types of above received mail is generally placed on 4 wheel nutting trucks except the containers of parcels that can be rolled onto the work room area as received. The 4 wheel nutting trucks are rolled in house for final distribution according to address. Sacks and parcels may weigh up to 70 pounds each. Containers and nutting trucks fully loaded could weigh several hundred pounds. The job of a clerk would then require stooping, bending, squatting, lifting, standing for long periods, and stretching arms in all directions when sorting mail in cases or boxing mail in lockboxes.
>
> Duties of Letter Carrier:
>
> Report at prescribed time and begin casing mail. Casing mail consists of standing at case for approximately 2 & $\frac{1}{2}$ hours and routing mail into case. Casing involves reaching above and below shoulder and some twisting back. Withdraws letter mail and flats, bundles same and pushes basket loaded with mail and parcels to vehicle for loading. Loads satchels with no more than 35 pounds of mail and delivers along prescribed route. Route is divided into park and loop segments which are walked by carrier. Each loop ends at parked vehicle. Carrier moves vehicle to next park point and repeats procedure. Sometimes carrier will deliver mail on curbside route, which means delivering mail without leaving vehicle to curbside mail receptacles. Required to deliver parcels weighing as much as 70 pounds. Must be good driver and be able to work out of doors in all types of weather for approximately 6 hours. Works inside office for approximately 2 hours. May be required to collect mail from collection boxes along main arteries and shopping centers. Involves frequent dismounts from vehicle as stooping and bending to make the collection.

Prewitt was awarded disability benefits, indicated that Prewitt had a 30% service-related disability that caused "limitation of motion of left shoulder and atrophy of trapezius," as well as that he had a kidney disease, hypertension, and an eye condition not related to his armed forces service.[4] The VA report was analyzed by Dr. Cenon Baltazar, a postal medical officer, who reported: "Limited records pertaining to [Prewitt] showed limitation of left shoulder and atrophy of trapezius muscle. This is not suitable for full performance as required of postal service positions unless it is a desk job." Prewitt subsequently received from Hughes a terse, two sentence letter informing him that Dr. Baltazar had determined that he was "medically unsuitable for postal employment." The letter did not state any reasons for this finding of unsuitability.[5]

After receiving word of this adverse determination, Prewitt contacted Hughes to dispute the conclusion of the medical officer. Hughes told Prewitt that there was no appeal from the decision, but that the deci-

sion would be reconsidered at the local level if Prewitt would undergo an examination, at his own expense, by a private physician. In fact, Prewitt did have the right to appeal to the postal service's regional medical director. After belatedly learning of this right, Prewitt exercised his right to appeal, but he chose not to undergo a new physical examination. The regional medical officer, Dr. Gedney, examined the VA report and concluded that Prewitt was medically unsuitable. Unlike Dr. Baltazar, who relied solely on Prewitt's shoulder injury as the basis for his adverse determination, Dr. Gedney also mentioned the kidney disease (which Dr. Gedney stated is an unpredictably progressive disease that could possibly be aggravated by arduous duty) and hypertension.[6] Based on Dr. Gedney's report, the regional office sustained the adverse determination and told Prewitt that there were no further medical appeal rights. Again, the letter did not inform Prewitt of the medical reasons upon which this conclusion was based.[7]

4. The VA report stated in full:
 Veteran 30% Service connected for:
 Res. P. O. perforating GSW, left neck and shoulder (Major), involving Mus Grp. I with injury to spinal accessory nerve, excision of neuroma, limitation of motion of left shoulder and atrophy of trapezius.
 Following disability are non-service connected:
 Res., glomerulonephritis [a kidney disease] with arterial hypertension Refractive error; pilonidal cyst.

5. The body of this letter states in full:
 I regret to inform you that our medical officer, C. Q. Baltazar, M.D. has determined that you are medically unsuitable for postal employment.
 Your interest in postal employment is appreciated.

6. Dr. Gedney's report stated:
 [A]pplicant's upper left extremity is a major extremity and has been injured by a gun shot wound of the left neck and shoulder resulting in limitation of motion of the left shoulder presumably limitation of range of motion above the shoulder level.
 In addition, applicant has a glomerulonephritis with arterial hypertension. Rating Decision states that arterial hypertension and glomerulonephritis pre-existed Service. This

is a progressive disease and is unpredictable in disability that it causes.
 Considering both the shoulder injury and the kidney disease, this applicant would not be medically suitable for job requiring heavy lifting, pushing and pulling—especially above shoulder level and from a standpoint of kidney disease I am unable to assure the Postal Service that he will be able to [be] steadily employed and capable of regular attendance. There is a distinct possibility that applicant's condition could be aggravated by arduous duty that is required.
 This recommendation is made in the best interest of the applicant's welfare and safety.

7. The body of this letter states in full:
 Dear Mr. Prewitt:
 This is in response to your appeal of the finding that you are medically unsuitable for employment with the United States Postal Service.
 A final review of your medical records has been completed by our Regional Medical Director, with full consideration given to the duties of the position for which you applied. Based on this review, it is our decision to sustain the recommendation that you are medically unsuitable for employment in this position. This is a final determination, and there are no further medical appeal rights. In selecting personnel to fill postal positions, we must be assured that employment with

Although the regional office correctly stated that there were no further *medical* appeal rights, in fact Prewitt had available to him an entirely independent chain of administrative review of the adverse determination through the postal service's equal employment opportunity (EEO) office. Prewitt filed an EEO complaint, alleging that the postal service had discriminated against him on the basis of his handicap by finding him unsuitable for postal employment. The EEO office conducted an investigation and found that the same medical officer who had disqualified Prewitt had ruled three other disabled or physically handicapped applicants suitable for postal employment. The investigation also revealed that the Greenville post office had hired fourteen persons classified as disabled and/or physically handicapped. Relying on these findings, the EEO office found no discrimination and advised Prewitt that he could appeal its decision to the Office of Appeals and Review of the Equal Employment Opportunity Commission (EEOC).[8]

As permitted by statute, 42 U.S.C. § 2000e–16(c), made applicable to the handicapped by 29 U.S.C. § 794a(a)(1), instead of appealing to the EEOC, Prewitt filed this suit in the district court. No contention is made by the postal service that Prewitt did not exhaust administrative remedies. The postal service responded to Prewitt's complaint with a motion for summary judgment, contending that it had rejected Prewitt for valid medical reasons, and that Prewitt's refusal to take a physical examination had precluded it from making a re-evaluation. The plaintiff responded that postal service regulations required that applicants be given a current physical examination before a medical determination is made, and therefore, even though Prewitt was afforded an opportunity to take a physical after his determination was made, the determination of medical unfitness was invalid. Prewitt further argued that the regulations entitled him to a free physical examination, so that he was not required to bear the expense of an examination by a private physician. Finally, Prewitt noted that in view of the undisputed fact that he had been able to perform competently a similar job in 1970, the postal service had failed to articulate any legitimate reason for its finding of medical unsuitability.

The district court reasoned that:

The key to this case lies in plaintiff's continued refusal to take a current physical examination. This refusal has rendered meaningless the defendant's attempt to re-evaluate plaintiff's current physical condition, though the postal service gave plaintiff ample opportunity to supplement the information available to it. The postal service extended plaintiff this opportunity at the initial stage of the procedure, and the opportunity remained open to plaintiff throughout the appellate process. Plaintiff simply cannot base a claim upon a 1970 medical examination when the Veterans Administration records presently available to defendant disclose substantial disability. . . .

the United States Postal Service will not adversely affect the health and well-being of any applicant. This is our primary concern in screening applicants for medical suitability.

We appreciate your interest in postal employment, and regret the findings were not favorable.

8. The proposed disposition of Prewitt's complaint which was adopted as the final agency decision, states in pertinent part:

You allege that you were discriminated against because of your physical handicap in that you were ruled unsuitable for postal employment on February 2, 1979, at the Greenville, MS, Post Office. The facts devel-oped during the investigation of August 23, 1979, revealed that you were considered for employment along with several other "non-handicapped" and "physically-handicapped" applicants. Appropriate medical authorities ruled that you were medically unsuitable for the postal clerk-carrier position. Three disabled or physically handicapped applicants were ruled suitable for employment by the same medical officer. The records further reveal that the Greenville, MS, Post Office has hired fourteen employees who are classified as disabled and/or physically handicapped. There is no indication that you were treated differently because of your physical handicap.

Accordingly, the district court granted the postal service's motion for summary judgment, and struck the class action allegations in Prewitt's complaint.

*The Applicable Legal Principles*

Our trial brother fell into error of law in his analysis by his implicit assumption that the "substantial disability" disclosed by the Veterans Administration records provided the postal service with legally sufficient grounds for rejecting Prewitt's bid for the clerk/carrier position. For reasons stated below, we find, construing the evidence in the light most favorable to the party resisting summary judgment, that under the Rehabilitation Act of 1973, as amended, a genuine issue of material fact exists as to whether the postal service's physical requirements for postal employment are sufficiently "job related" to provide lawful grounds for the refusal to hire Prewitt.

1. *The Applicability of the Rehabilitation Act to Federal Government Hiring*

Only since 1978 have handicapped individuals been entitled to bring private actions against federal agencies for violations of the Rehabilitation Act. This is apparently the first case in which a federal appellate court has been called upon to determine the nature and extent of this newly-created private right. We shall therefore examine the history of this legislation in some detail.

Congress passed the Rehabilitation Act of 1973 for the express purpose, inter alia, of "promot[ing] and expand[ing] employment opportunities in the public and private sectors for handicapped individuals." 29 U.S.C. § 701(8). In addition to creating a number of wide-ranging federally-funded programs designed to aid handicapped persons in assuming a full role in society, the Act, in its Title V, established the principle that (a) the federal government, (b) federal contractors, and (c) recipients of federal funds cannot discriminate against the handicapped.

The duties of each of these three classes of entities were set forth in separate sections. Section 503 of the Act, 29 U.S.C. § 793, required federal contractors to include in their contracts with the United States a provision mandating that, in employing persons to carry out the contract, "the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals...." Section 504, 29 U.S.C. § 794, which imposed duties on recipients of federal funds, provided: "No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

The duties of the federal government itself were set forth in section 501(b), 29 U.S.C. § 791(b) which stated:

Each department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch shall ... submit to the Civil Service Commission and to the [Interagency Committee on Handicapped Employees] an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met. * * *

A Senate committee report commenting on section 501 emphasized that "the Federal Government must be an equal opportunity employer, and that this equal opportunity must apply fully to handicapped individuals." [9] As Senator Cranston subsequently commented in connection with 1978 amendments strengthening the federal employment rights of the handicapped, "[t]he legislative history of the section 501 illustrates

---

9. S.Rep.No.93–318, 93d Cong., 1st Sess., at 49 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2076, 2122.

that with respect to the employment of handicapped individuals, Congress expected the Federal Government should be a leader." [10] In the words of Senator Williams, Congress enacted section 501 "to require that the Federal Government itself act as the model employer of the handicapped and take affirmative action to hire and promote the disabled." [11]

Under the original 1973 Rehabilitation Act, a private cause of action founded on handicap discrimination was not recognized upon section 501 as against a federal government employer; the literal statutory wording merely required federal agencies to *submit* affirmative actions plans.[12] However, due to differences in statutory wording, all courts that considered the issue found that section 504 established a private cause of action for handicapped persons subjected to discrimination by recipients of federal funds,[13] while the federal courts

split on the question whether the same was true under section 503 for individuals subjected to handicap discrimination by federal contractors.[14]

In 1978, the Rehabilitation Act was amended to provide a private cause of action in favor of persons subjected to handicap discrimination by the federal government employing agencies. In the House, an amendment was adopted and ultimately enacted by the Congress that extended section 504's proscription against handicap discrimination to "any program or activity conducted by an Executive agency or by the United States Postal Service;" [15] the legislative history, as well as the judicial interpretations (see note 13), fully recognized that a private right of action had been created by section 504.[16]

The Senate, at the same time, added a new section 505(a)(1) to the Rehabilitation

**10.** Cong.Rec. S15591 (Sept. 20, 1978).

**11.** Rehabilitation of the Handicapped Programs 1976: Hearings Before the Subcommittee on the Handicapped of the Committee on Labor and Public Welfare, 94th Cong., 2d Sess., at 1502 (1976), *quoted in* Linn, *Uncle Sam Doesn't Want You: Entering the Federal Stronghold of Employment Discrimination Against Handicapped Individuals*, 27 DePaul L.Rev. 1047, 1060 (1978).

**12.** *See Counts v. United States Postal Service*, 17 F.E.P. Cases 1161, 1165 (N.D.Fla.1978), *reversed due to statutory changes*, 631 F.2d 46 (5th Cir. 1980); *Coleman v. Darden*, 15 F.E.P. Cases 272, 273 (D.Colo.1977), *aff'd*, 595 F.2d 533 (10th Cir. 1979); B. Schlei & P. Grossman, Employment Discrimination Law 65 (Supp. 1979). *But see* Linn, *supra* note 11, at 1056–71 (urging recognition of a private right of action under section 501).

**13.** *See Camenisch v. University of Texas*, 616 F.2d 127, 131 (5th Cir. 1980), *vacated on other grounds*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), and cases from the Seventh, Second, Eighth, Fourth, and Third Circuits cited therein.

**14.** *Compare Brown v. Sibley*, 650 F.2d·760, 763–65 (5th Cir. 1981); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1980); *Hoopes v. Equifax, Inc.*, 611 F.2d 134, 135 (6th Cir. 1979); *Anderson v. Erie Lackawanna Railway Co.*, 468 F.Supp. 934 (E.D.Ohio 1979); *Wood v. Diamond State Telephone Co.*, 440 F.Supp. 1003, 1010 (D.Del.1977); *and Moon v. Roadway Express, Inc.*, 439 F.Supp. 1308, 1310 (N.D.Ga.

1977) *with Clarke v. FELEC Services, Inc.*, 489 F.Supp. 165, 169 (D.Alaska 1980); *Hart v. Alameda County*, 485 F.Supp. 66, 76 (N.D.Cal. 1979); *Chaplin v. Consolidated Edison Co.*, 482 F.Supp. 1165, 1173 (S.D.N.Y.1980); *Duran v. City of Tampa*, 430 F.Supp. 75, 78 (M.D.Fla. 1977); *Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809, 816 (E.D.Pa.1977); and *Rogers v. Frito-Lay, Inc.*, *supra*, 611 F.2d at 1085 (Goldberg, J., dissenting).

**15.** The amended section 504, 29 U.S.C. § 794, now states in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or any program or activity conducted by any Executive agency or by the United States Postal Service.

(Emphasis supplied.)

**16.** *See, e. g.*, the legislative history cited by Judge Goldberg in his dissenting opinion in *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1096–98 (5th Cir. 1980), a *section 503* case. Although the *Rogers* majority held that this legislative history does not prove the existence of a private right of action under *section 503* of the Rehabilitation Act, this legislative history at least shows that the 1978 Congress had no quarrel with the near-unanimous judicial interpretation of *section 504*.

Act, which created a private right of action under section 501. The provision states:

> The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–16], including the application of sections 706(f) through 706(k), [42 U.S.C. § 2000e–5], shall be available, with respect to any complaint under section 501 of this Act, to any employee or applicant for employment aggrieved by the final deposition of such complaint, or by the failure to take final action on such complaint.

 Section 717 of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16, to which section 501 is explicitly tied by the new section 505, mandates that all federal personnel actions be made "free from any discrimination based on race, color, religion, sex, or national origin." The provision further provides for a private right of action in favor of those whose claims of discrimination have not been satisfactorily resolved by administrative procedures. However, before an individual can bring a section 717 action in court, strict procedural requirements with respect to exhaustion of administrative remedies must be fulfilled. *See* 42 U.S.C. § 2000e–16(c). Once administrative remedies have been exhausted, however, an individual is entitled to de novo consideration of his discrimination claims in the district court; however, prior administrative findings made with respect to an employment discrimination claim may be admitted into evidence at the trial de novo. *See Chandler v. Roudebush*, 425 U.S. 840, 863–64, 96 S.Ct. 1949, 1960–61, 48 L.Ed.2d 416 (1976).

The Senate Committee on Human Resources explained its reasons for granting the rights set forth in section 717 to section 501 plaintiffs:

> In testimony before the Subcommittee on the Handicapped, Deborah Kaplan of the Disability Rights Center noted that she had been examining the implementation of section 501 and recommended that legislative changes be made to "make it stronger and easier to enforce and to provide the same civil rights protection to the disabled that other minorities have in employment with the Federal Government." Ms. Kaplan's group discovered that in the first 2 years after enactment of section 501 "only 12 Federal agencies have increased their rate of hiring disabled employees by more than 3 percent."
>
> The committee believes now as it did in 1973 that the Federal Government must be "an equal opportunity employer." The amendment to section 501 will aid in attaining that goal by providing for individuals aggrieved on the basis of their handicap the same rights, procedures, and remedies provided individuals aggrieved on the basis of race, creed, color, or national origin.... Further, application of the title VII provisions makes specific the right to bring a private right of action with respect to section 501, subject, of course, to the provision for exhaustion of administrative remedies and other rules and procedures set forth in title VII.

Sen.Rep.No.95–890, 95th Cong., 2d Sess., at 18–19 (1978). *See also* Cong.Rec. S15591 (Daily ed. Sept. 20, 1978) (remarks of Sen. Cranston).

The scope of the federal government's obligations under section 501 received Senate attention during debate on a proposed amendment to the proposed new section 505(a)(1). An amendment offered by Senator McClure would have added the following clause at the end of section 505(a)(1): "provided, however, that no equitable relief or affirmative action remedy disproportionately exceeding actual damages in the case shall be available under this section." Cong.Rec. S15664 (Daily ed. Sept. 21, 1978). Senator McClure explained that his amendment "would provide that the federally financed affirmative action remedy ... could not be used to initiate massive construction projects for relatively minor temporal damages." *Id.*

Senators Cranston and Stafford spoke in opposition to the McClure amendment. Senator Cranston remarked:

> I believe that the requirement with respect to Federal Contractors and grantees should be no less stringent than

the requirements attached to the Federal Government. The amendment offered by the Senator from Idaho would create an unwise and unrealistic distinction with respect of employment between the obligations of the Federal Government and the obligations of Federal contractors and grantees. Ironically, the Senator's amendment would limit—with a financial test—the Federal Government's obligation of being an equal opportunity employer. Federal contractors and grantees would—appropriately—continue to be required to be equal opportunity employers. Rather than a leader in this field, the Federal Government would become a distant also-ran requiring more of its grantees and contractors than it would be willing to require of itself.

*Id.* at S15665–66.

The dispute was resolved when Senator McClure and the managers of the bill agreed upon the following compromise language: "In fashioning an equitable or affirmative action remedy under such section [section 501], a court may take into account the reasonableness of the cost of any necessary workplace accommodation, and the availability of alternative therefor or other appropriate relief." *Id.* at S15667. As thus amended, the new section 505(a)(1) was enacted into law, and is now codified as 29 U.S.C. § 794a(a)(1).[17]

In summary, the 1978 amendments to the Rehabilitation Act 1) established a private right of action, subject to the same procedural constraints (administrative exhaustion, etc.) set forth in Title VII of the Civil Rights Act, in favor of section 501 claimants, and 2) extended section 504's proscription against handicap employment discrimination to cover the activities of the federal government itself.

Thus, by its 1978 amendments to the Rehabilitation Act, Congress clearly recognized both in section 501 and in section 504 that individuals now have a private cause of action to obtain relief for handicap discrimination on the part of the federal government and its agencies. The amendments to section 504 were simply the House's answer to the same problem that the Senate saw fit to resolve by strengthening section 501. The joint House-Senate conference committee could have chosen to eliminate the partial overlap between the two provisions, but instead the conference committee, and subsequently Congress as a whole, chose to pass both provisions, despite the overlap. "When there are two acts upon the same subject, the rule is to give effect to both if possible." *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). By this same principle, in order to give effect to *both* the House and the Senate 1978 amendments finally enacted, we must read the exhaustion of administrative remedies requirement of section 501 into the private remedy recognized by both section 501 and section 504 for federal government handicap discrimination.

### 2. *Prewitt's Present Claim(s) of Handicap Discrimination*

In the present suit, Prewitt claims that, despite his handicap, he is physically able to perform the job for which he applied, but that the postal service's physical requirements, neutral on their face, had *disparate impact* upon a person with his particular handicap and that they excluded him from employment that in fact he was physically able to perform. The present case was dismissed on summary judgment, through a failure to take into account the principles

---

**17.** The new section 505(a)(1), 29 U.S.C. § 794a(a)(1), added by the Senate amendment to the Rehabilitation Act provides:

The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964, including the application of sections 706(f) through 706(k), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposi-

tion of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

applicable to the federal government by the Rehabilitation Act of 1973, as amended in 1978; due to disputed issues of material fact, as will be stated, summary judgment was improvidently granted.

■ To anticipate issues that will arise on the remand, we will also take judicial notice of further factual developments set forth in the record of a companion suit, which was consolidated with the present one for appeal, an opinion in which is rendered this same date, *Prewitt v. United States Postal Service*, 662 F.2d 311 (5th Cir. 1981), Docket No. 81–4205 (1981). This latter case concerns Prewitt's suit with regard to the 1980 rejection of his new application for employment for a position as a substitute rural carrier at the Greenville post office. At a hearing on Prewitt's motion for a preliminary injunction, after which the district court dismissed Prewitt's complaint (a dismissal we vacate today), testimony was submitted by the postal service that made specific the factual reasons why the postal service believes Prewitt had to be rejected because of his physical condition. The physical requirements for the substitute rural carrier position for which Prewitt applied in 1980, it should be noted, are much the same as those for the clerk-carrier position involved in the present suit. *See* notes 2 and 3.

■ One of the chief physical factors upon which the postal service bases its refusal to hire Prewitt is that, due to Prewitt's inability to lift his left arm above shoulder level, the employing authority feels that he cannot "case" (sort) the mail that he would be required to deliver on his route. Because a carrier is required to lift above shoulder level with both hands to remove stacks of mail from a six-foot-high top ledge, the postal service contends that Prewitt would not be able to do this part of the job without some workplace modification—however, the postal service witness admitted, for instance, that Prewitt could be accommodated simply by lowering the legs to which the shelves are attached.[18] Only if Prewitt, despite his handicap, can perform the essential duties of the position in question, without the need for any workplace accommodation, can it be said that he was a victim of "disparate impact" discrimination. However, even if Prewitt cannot so perform, he might still be entitled to relief if he was a victim of "surmountable barrier" discrimination, *i. e.,* if he was rejected even though he could have performed the essentials of the job if afforded reasonable accommodation.[19]

Since both issues will arise on the remand, we will therefore note the principles applicable to judicial determination of both cases involving claims of "disparate impact" and also of "surmountable barrier" ("the duty to make reasonable accommodation") discrimination against a handicapped person.

---

**18.** The second principal factor upon which the postal service relies is the severe pain that a VA report indicates that Prewitt suffers after lifting. Prewitt denies the pain or at least its severity. This type of handicap may be either a surmountable or insurmountable employment barrier. See text and note 25 *infra*.

**19.** Commentators have identified four distinct types of discriminatory barriers that handicapped persons must confront when seeking employment: 1. Intentional discrimination for reasons of social bias (racial, sexual, religion, handicap, etc.); 2. neutral standards with disparate impact; 3. surmountable impairment barriers; and 4. insurmountable impairment barriers. *See* Note, Accommodating the Handicapped: *The Meaning of Discrimination Under Section 504 of the Rehabilitation Act*, 55 N.Y.U. L.Rev. 881, 883–84 (1980). *See also* Gittler, *Fair Employment and the Handicapped: A Le-*

*gal Perspective*, 27 DePaul L.Rev. 953, 958–66 (1978).

The present complaints by Prewitt involve alleged "disparate impact" and a "surmountable barrier" handicap-discrimination.

The Title VII jurisprudence is, we believe, for the most part applicable to intentional social-bias discrimination against handicapped persons. See *Texas Department of Corrections v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Likewise, as will be noted in the text, the Title VII disparate impact decisions are relevant in the determination of disparate impact handicap discrimination. Surmountable and insurmountable barriers raise issues that for the most part are peculiar to handicap discrimination.

Preliminarily, however, we should observe that section 501 requires affirmative action on the part of federal agencies; unlike section 504 of the Rehabilitation Act and Title VII of the Civil Rights Act which usually require only nondiscrimination. In *Ryan v. Federal Deposit Insurance Corp.*, 565 F.2d 762, 763 (D.C.Cir.1977), the court held, and we agree, especially in light of the 1978 amendments, that section 501 requires that federal agencies do more than just *submit* affirmative plans—section 501 "impose[s] a duty upon federal agencies to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." Although *Ryan*, which was decided prior to the 1978 amendments, did not recognize a private right of action under section 501, the court held that the defendant federal agency should amend its procedures to provide an administrative forum through which handicapped individuals could enforce their section 501 rights. *Id.* at 764. Subsequent to *Ryan*, the Civil Service Commission, and its successor enforcement agency, the EEOC, promulgated administrative regulations that define the section 501 duties of federal agencies, *see* 29 C.F.R. §§ 1613.701 *et seq.*, which for instance (see below) include the duty to make reasonable accommodation to employ a handicapped person, *see* 29 C.F.R. § 1613.704. These regulations are the administrative interpretation of the Act by the enforcing agency and are therefore entitled to some deference in our attempt to determine the applications of this statute. *See Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971).

### 3. *"Disparate Impact" Discrimination*

*Griggs v. Duke Power Company, supra*, may be considered the seminal decision concerning instances whereby a facially neutral employment policy has a discriminatory impact upon the employment of individuals statutorily protected against discrimination. There the Court held that an employer's use of written tests and a high school degree requirement violated Title VII of the Civil Rights Act of 1964 because the criteria were not shown to be related to job performance. The unanimous Court reasoned: "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853. *See also Albemarle Paper Co. v. Moody, supra.* In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court extended *Griggs* and held that the use of physical requirements (specifically, a 120 pound minimum weight requirement) as employment criteria violates Title VII if the criteria disproportionately exclude women and are not shown by the employer to be job related. *Id.* 433 U.S. at 328–331, 97 S.Ct. at 2726–28.

In the discriminatory impact context, a plaintiff need not prove that the employer acted with discriminatory intent. *Griggs, supra*, 401 U.S. at 430–32, 91 S.Ct. at 853–54; *Teamsters v. United States*, 431 U.S. 324 n.15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). All a plaintiff need prove to establish a prima facie case is that the challenged standard disparately disadvantages the protected group of which he is a member, and that he is qualified for the position under all but the challenged criteria. The burden of persuasion then shifts to the employer to prove that the challenged criteria are "job related," *i. e.*, that they are required by "business necessity." *Moody, supra*, 422 U.S. at 425, 95 S.Ct. at 2375; *Griggs, supra*, 401 U.S. at 431, 91 S.Ct. at 853; *Johnson v. Uncle Ben's, Inc.*, 657 F.2d 750 (5th Cir. 1981).

The EEOC regulations adopt a *Griggs*-type approach in the disparate impact handicap discrimination context. They require federal agencies not to use any se-

lection criterion that "screens out or tends to screen out qualified handicapped persons or any class of handicapped persons" unless the criterion, as used by the agency, is shown to be "job-related for the position in question." 29 C.F.R. § 1613.705. The test is whether a handicapped individual who meets all employment criteria except for the challenged discriminatory criterion "can perform the essential functions of the position in question without endangering the health and safety of the individuals or others." If the individual can so perform, he must not be subjected to discrimination. 28 C.F.R. §§ 1613.702(f) & .703. *Cf. New York State Association for Retarded Children v. Carey,* 612 F.2d 644, 649–50 (2d Cir. 1979) (discriminatory exclusion of handicapped children from regular public school classes unlawful in the absence of "at least some substantial showing" by the school authorities that the exclusion is necessary).

In our opinion, in the disparate impact context, there should be only minor differences in the application of the *Griggs* principles to handicap discrimination claims. One difference, however, is that, when assessing the disparate impact of a facially-neutral criterion, courts must be careful not to group all handicapped persons into one class, or even into broad subclasses. This is because "the fact that an employer employs fifteen epileptics is not necessarily probative of whether he or she has discriminated against a blind person." [20]

In a section 504 handicap discrimination case, the Supreme Court held that the Rehabilitation Act does not require redress of "insurmountable barrier" handicap discrimination—that the statutory language prohibiting discrimination against an "otherwise qualified handicapped individual" means qualified *"in spite" of* his handicap, not qualified in all respects except for being

handicapped. *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (emphasis added).

The *Davis* rationale is equally controlling in the employment discrimination context. Accordingly, employers subject to the Rehabilitation Act need not hire handicapped individuals who cannot fully perform the required work, even with accommodation. However, while *Davis* demonstrates that only individuals who are qualified "in spite of" their handicaps need be hired, *Griggs* and its progeny dictate that the employer must bear the burden of proving that the physical criteria are job related. If the employer does this, then the burden of persuasion to show that he can satisfy these criteria rests on the handicapped applicant.

4. *"Surmountable Barrier" Discrimination, or the Duty to Make Reasonable Accommodation*

Federal employers, including the postal service, are obliged by section 501(b) to provide reasonable accommodation for the handicapped.[21] As the *Davis* Court pointed out, 442 U.S. at 410, 99 S.Ct. at 2369, section 501(b), unlike section 504, explicitly requires federal government employers to undertake "affirmative action" on behalf of the handicapped. And the new section 505, added by Congress in 1978, explicitly permits courts to fashion "an equitable or affirmative action remedy" for violations of section 501, with the caveat that "the reasonableness of the cost of any necessary workplace accommodation" should be taken into account. The legislative intent reflected in the creation of a handicap discrimination private action clearly shows that federal government employers must

---

**20.** Gittler, *supra* note 19, at 972. Thus, the postal service's reliance on the fact that the Greenville office has hired numerous handicapped persons is misplaced.

**21.** This court has consistently held that section 504 also mandates reasonable accommodation, thus prohibiting surmountable barrier discrimination by federal grantees against the handi-

capped. *See Majors v. Housing Authority of the County of DeKalb Georgia,* 652 F.2d 454, 457–58 (5th Cir. 1981); *Tatro v. State of Texas,* 625 F.2d 557, 564 (5th Cir. 1980); *Camenisch v. University of Texas,* 616 F.2d 127, 132–33 (5th Cir. 1980), *vacated on other grounds,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

make reasonable accommodation for handicapped job applicants.

■ There is a dearth of decisional law on this issue.[22] However, the EEOC administrative regulations, which, as noted above, are entitled to deference, provide some basis for outlining the contours of the surmountable barrier accommodation duty.

The relevant EEOC regulation, 29 C.F.R. § 1613.704, provides:

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force;

and (3) the nature and the cost of the accommodation.

■ Thus, under subsection (a) of this provision, the burden of proving inability to accommodate is upon the employer. The administrative reasons for so placing the burden likewise justify a similar burden of proof in a private action based upon the Rehabilitation Act. The employer has greater knowledge of the essentials of the job than does the handicapped applicant. The employer can look to its own experience, or, if that is not helpful, to that of other employers who have provided jobs to individuals with handicaps similar to those of the applicant in question. Furthermore, the employer may be able to obtain advice concerning possible accommodations from private and government sources. *See* Note, *Accommodating the Handicapped: Rehabilitating Section 504 After* Southeastern, 80 Colum.L.Rev. 171, 187–88 (1980).

■ Although the burden of persuasion in proving inability to accommodate always remains on the employer, we must add one caveat. Once the employer presents credible evidence that indicates accommodation of the plaintiff would not reasonably be possible, the plaintiff may not remain silent. Once the employer presents such evidence, the plaintiff has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *See* Note, *supra,* 80 Colum.L.Rev. at 189.

In addition, subsections (a) and (c) of 29 C.F.R. § 1613.704, which limit the employ-

22. Outside the handicap discrimination context, the "reasonable accommodation" issue has arisen in cases involving persons who claim a right to accommodation of their religious duty to refrain from working on certain days. In *Trans World Airlines v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977), the Supreme Court interpreted § 701(j) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(j), which requires employers to accommodate such religious practices, unless to do so would impose "undue hardship." The Court held that an employer need not accommodate such persons if the accommodation would require "more than a *de minimis* cost."

The *Hardison* principles are not applicable in the federal-employer handicap discrimination context. Congress clearly intended the federal government to take measures that would involve more than a *de minimis* cost. As the debate over the McClure amendment shows, Congress was even unwilling to approve language that would have limited the government's duty to make reasonable accommodation to instances in which the cost of accommodation does not "disproportionately exceed[ ] actual damages." *See* text at note 17 *supra.*

er's duty to accommodate to instances where accommodation would not impose "undue hardship" and define the factors to be used in determining whether a particular accommodation would impose "undue hardship," accurately express congressional intent. The second sentence of section 505, which admonishes the courts to "take into account the reasonableness of the cost of any necessary workplace accommodation," was added as compromise language in response to Senator McClure's concern that federal employers might be obliged "to initiate massive construction projects." The EEOC regulations adequately respond to this concern.

*Genuine Disputed Issues of Material Fact Preclude Summary Judgment*

The factual showing before the district court was that the postal service rejected Prewitt's application for employment because it felt, on the basis of the medical records supplied to it, that Prewitt could not perform the "arduous" duties of the position. In view of the undisputed fact that Prewitt had satisfactorily performed a similar postal job in 1970 despite his physical handicap, as well as of his *uncontradicted* affidavit that his physical condition was substantially unchanged since then, Prewitt raised a genuine issue of material fact as to whether the postal service's physical standards for employment are sufficiently "job related" to justify the employer's refusal to hire him. Under the applicable legal principles earlier set forth, therefore, the postal service is not shown under the facts thus far educed to have been justified as a matter of law in denying Prewitt's application. The summary judgment must therefore be reversed.[23]

We should note that the postal service contends that the postal service rejected him because he refused its request that he take a current physical examination to establish his medical suitability for employment. This contention is based upon the showing that, *after* Prewitt was found medically unsuitable for employment, he was informally advised by the local postmaster that he would be reconsidered if he secured a new medical examination.

However, the record reveals that Prewitt's application was rejected because he was found to be medically unsuitable (without notifying Prewitt of the specific medical reasons), not because he refused to furnish any further or more current medical information. See text *supra* at notes 4–7. Indeed, Prewitt's essential position was that his physical condition and the effect of his disability was unchanged since 1970 and that, even accepting the disability reflected by the VA medical reports upon which the postal service relied, he was physically qualified to perform the duties of the position for which he applied, as instanced by his earlier satisfactory performance of the duties of a similar postal position.[24]

*On the Remand*

On the basis of the factual showing thus far made, we reverse the summary judgment dismissing Prewitt's handicap-discrimination claim. We remand for further proceedings in accordance with the views set forth in this opinion. To summarize:

(1) Prewitt, the disabled claimant, may establish a prima facie case of unlawful discrimination by proving that: (a) except for his physical handicap, he is qualified to fill the position; (b) he has a handicap that pre-

---

**23.** Further, from the factual showing educed at the hearing in the companion appeal, 662 F.2d 311 (1981), we know that on the remand a substantial factual issue will arise as to whether the postal service has complied with its duty to make a reasonable accommodation for Prewitt's handicap, insofar as its refusal to employ him is based upon his inability to use his left arm to lift items off a six-foot-high ledge.

**24.** Further, as the hearing in the companion suit shows, the underlying reason for the postal service's rejection of Prewitt's application was the restriction in motion of the left shoulder and limitation of range of motion of the left arm, the permanent disability resulting from the 1969 shoulder injury; a current physical examination would have reflected permanent disability no less than that reflected in the medical records available to the postal service upon which it based its rejection of Prewitt's application.

vents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job related." [25]

(2) Once the prima facie case of handicap discrimination is established, the burden of persuasion shifts to the federal employer to show that the physical criteria offered as justification for refusal to hire the plaintiff are "job related," i. e., that persons who suffer from the handicap plaintiff suffers and who are, therefore, unable to meet the challenged standards, cannot safely and efficiently perform the essentials of the position in question. If the issue of reasonable accommodation is raised, the agency must then be prepared to make a further showing that accommodation cannot reasonably be made that would enable the handicapped applicant to perform the essentials of the job adequately and safely; in this regard, the postal service must "demonstrate that the accommodation would impose an undue hardship on the operation of its program," 29 C.F.R. § 1613.704(a), taking into consideration the factors set forth by 704(c) of the cited regulation.

(3) If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection criteria without a similar discriminatory effect would also serve the employer's legitimate interest in efficient and trustworthy workmanship. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Johnson v. Uncle Ben's, Inc.*, 657 F.2d 750, 752 (5th Cir. 1981). When the issue of reasonable accommodation is raised, the burden of persuasion in proving inability to accommodate always remains on the employer; however, once the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff must bear the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made.

*Conclusion*

We of course express no opinion as to the merits of Prewitt's claim. If he is unable to perform the essentials of the position for which he has applied, with or without reasonable accommodation, the postal service need not hire him. The ultimate test is whether, with or without reasonable accommodation, a handicapped individual who meets all employment criteria except for the challenged discriminatory criterion "can perform the essential functions of the position in question without endangering the health and safety of the individuals or others." 28 C.F.R. § 1613.702(f). Since a disputed issue of material fact is shown as to this issue, the summary judgment granted by the district court must be REVERSED.

---

**25.** In the hearing in the companion case, a further aspect of Prewitt's shoulder disability was raised. On a 1980 VA report, made when Prewitt attempted to secure an increase in his military disability benefits, it is noted that Prewitt complains of severe pain after lifting. Prewitt denies that he suffers any such pain. If Prewitt indeed suffers substantial pain in the performance of his duties, he may be unable to "perform the essential functions of the position in question without endangering the health and safety of himself or others," 28 C.F.R. § 1613.-702(f). He may for this reason be unable to make the requisite showing for a prima facie case that he is qualified to fill the position, unless he can make a plausible showing that reasonable accommodation is possible.

Therefore, if on the remand the postal service raises this issue by credible evidence, Prewitt will have the burden of persuasion that he does *not* suffer from substantial and disabling pain when lifting—a matter peculiarly within his knowledge, evidence as to which is more available to him than to the employing agency. However, a failure of Prewitt to meet this burden is not necessarily fatal to his case. While Prewitt denies suffering pain when lifting, he also argues in the alternative that reasonable accommodation is possible through an inexpensive mechanical device (a transferable handle); if the pain-causation is proved and the issue of reasonable accommodation arises, then as in other accommodation cases (see text *supra*), the postal service will have the burden of persuasion that such accommodation is not feasible or reasonable.

We also VACATE the court's decision to strike the class action allegations of Prewitt's complaint, which was primarily based on the perceived lack of merit of Prewitt's individual claim. We do not intimate that Prewitt's suit shows that it satisfies the prerequisites to a class action, only that no hearing has been held on pleadings directed to this issue.

SUMMARY JUDGMENT REVERSED; STRIKING OF CLASS ACTION ALLEGATIONS VACATED.