Frank G. SILVA, Plaintiff,

v.

Michael CHERTOFF, Secretary,
Department of Homeland
Security, Defendant.

No. EP–05–CA–443–FM.

United States District Court,
W.D. Texas,
El Paso Division.

March 19, 2007.

Francisco X. Dominguez, The Law Office of Francisco X. Dominguez, El Paso, for Plaintiff.

Magdalena G. Jara, Assistant U.S. Attorney, El Paso, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTIONS IN PART AND SUSTAINING THEM IN PART—AND—GRANTING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

FRANK MONTALVO, District Judge.

Before the Court is Defendant Michael Chertoff's ("Defendant") "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" ("Motion") [Rec. No. 22], filed through the Assistant United States Attorney in this employment discrimination action on November 3, 2006. After obtaining an enlargement of time, Plaintiff Frank G. Silva ("Silva") timely filed his "Response to Defendant's Motion to Dismiss or for Summary Judgment" ("Response") [Rec. No. 26] on November 28, 2006. Defendant's "Objections to Plaintiff's Summary Judgment Evidence" ("Objections") [Rec. No. 28] and "Reply to Plaintiff's Response to Defendant's Motion to Dismiss or, in the Alternative[,] Motion for Summary Judgment" ("Reply") [Rec. No. 30] followed on December 11, 2006 and December 13, 2006, respectively.

After carefully considering the record and pleadings in this cause, the Court concludes it should **OVERRULE** Defendant's Objections **IN PART** and **SUSTAIN** them **IN PART.** The Court further concludes it should **GRANT** Defendant's Motion in its entirety.

### I. BACKGROUND

This lawsuit arises from the United States Border Patrol's ("the Border Patrol" or "the agency") termination of Silva's employment as an Electronics Technician on February 21, 2004. At all times relevant to this litigation, Silva's duty station was the El Paso Sector Electronics Branch, Las Cruces, New Mexico division.

Silva's discharge ensued after the agency declined his request for a permanent light-duty assignment in the El Paso division following an injury he sustained on the job and Silva did not accept the agency's thrice-repeated offer of reassignment as a Law Enforcement Communications Officer ("LECA").

### A. Silva's Claims

In his "Original Complaint" ("Complaint") [Rec. No. 1] filed on November 28, 2005, Silva alleges the Border Patrol engaged in unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("the ADEA"); and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791. Specifically, Silva asserts the agency violated Title VII when it illegally discriminated against him on the basis of his race (Mestizo/non-white) and national origin (Mexican) by subjecting him to heightened scrutiny and different employment terms and conditions, which included the agency's alleged failure to reasonably accommodate Silva following his injury. Silva, who was fifty-two years old upon his removal from federal service, further asserts that the agency violated the ADEA by subjecting him to disparate treatment. Silva additionally contends the agency violated the Rehabilitation Act by failing to reasonably accommodate his actual physical disability or discriminating against him on the basis of a perceived physical disability. Silva lastly avers that agency personnel unlawfully retaliated against him for opposing discrimination or engaging in a protected activity.

### B. Defendant's Motion

In his Motion, Defendant counters that Silva has not set forth a prima facie case of discrimination or retaliation under Title VII, the ADEA, or the Rehabilitation Act.

The Court understands Defendant to assert that he is therefore entitled to have the Court dismiss Silva's Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant further argues that, to the extent Silva asserts he is entitled to relief under the Rehabilitation Act on the theory that agency personnel discriminated against him because they "regarded him as disabled," Silva failed to raise this claim in his complaint to the Equal Employment Opportunity Commission ("EEOC"). Therefore, Defendant asserts, Silva has failed to exhaust his administrative remedies insofar as he contends the agency "regarded him as disabled." Because exhaustion of administrative remedies is a jurisdictional prerequisite for federal court review of Rehabilitation Act claims, Defendant moves the Court dismiss the "regarded as disabled" aspect of Silva's Rehabilitation Act claim pursuant to Federal Rule of Civil Procedure 12(b)(1).

Alternatively, Defendant asserts that, even assuming Silva has established a prima facie case of discrimination and retaliation, Defendant has articulated legitimate and nondiscriminatory reasons for its decisions regarding Silva's employment. Because Silva has not carried his burden of production by presenting admissible or minimally persuasive evidence that Defendant's proffered reasons were a pretext for discrimination, Defendant contends he is accordingly entitled to summary judgment in this action. Related to the latter argument is Defendant's assertion in his Objections that the "Declaration of Narciso Retana" attached to Silva's Response does not represent competent summary judgment evidence.

Finally, Defendant argues that if the Court denies his Motion regarding Silva's ADEA claim, Silva is nonetheless not entitled to a jury trial on his age discrimina-

tion cause of action. Silva concedes that he is not entitled to a jury trial on his ADEA claim. He nonetheless urges the Court to allow a jury empaneled to adjudicate the merits of his other claims to render an advisory opinion concerning his age discrimination allegations.

## II. *LEGAL STANDARDS*

The Court now considers the legal standards governing Defendant's Motion.

### A. Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") addresses the court's subject matter jurisdiction, which derives from the Case or Controversy Clause of Article III of the United States Constitution.[1] Because federal courts are courts of limited jurisdiction, it is presumed that a case lies outside their jurisdiction unless proven otherwise.[2] Rule 12(b)(1) demands dismissal if the court lacks jurisdiction over the subject matter of the plaintiff's complaint.[3] The burden of proof on a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.[4] " 'A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.' "[5]

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction cannot be converted into a motion for summary judgment.[6] Nevertheless, the court may consider

> outside matters which are attached to a motion to dismiss without first converting it into a motion for summary judgment "if the material is pertinent to the question of the District Court's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction."[7]

### B. Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."[8] Nonetheless, a "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."[9] That is, a court

---

1. U.S. Const. art. III.; *Finley v. United States,* 490 U.S. 545, 558, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) ("Article III of the Constitution identifies the categories of 'Cases' and 'Controversies' that federal courts may have jurisdiction to decide.").

2. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376–78, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *see also Turner v. Bank of N. Am.,* 4 U.S. 8, 11, 4 Dall. 8, 1 L.Ed. 718 (1799); *Texas v. West Pub. Co.,* 882 F.2d 171, 176 (5th Cir.1989).

3. Fed.R.Civ.P. 12(b)(1); *see Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001).

4. *See Strain v. Harrelson Rubber Co.,* 742 F.2d 888, 889 (5th Cir.1984); *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980).

5. *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996)).

6. *See Green v. Forney Eng'g Co.,* 589 F.2d 243, 246 (5th Cir.1979).

7. 589 F.2d at 247 (citing *State of Alabama ex rel. Baxley v. Woody,* 473 F.2d 10, 12 (5th Cir.1973)); *see also Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996) (holding that, in ruling on a 12(b)(1) motion, the court may examine evidence outside the pleadings).

8. Fed.R.Civ.P. 12(b)(6).

9. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982).

should not grant a motion to dismiss pursuant to Rule 12(b)(6) unless it appears certain that the plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief.[10] "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, [and] not to assay the weight of the evidence which might be offered in support thereof.' "[11] Thus, when considering a Rule 12(b)(6) motion, a court must accept all well-pleaded facts as true, and construe all reasonable inferences in the light most favorable to the plaintiffs.[12] The principles set forth above are nevertheless subject to limitations. Although the Court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[13] Moreover, where a complaint shows on its face that it is barred by an affirmative defense, a court may dismiss the action for failing to state a claim.[14]

## C. The Summary Judgment Standard

Federal Rule of Civil Procedure 56 ("Rule 56") governs motions for summary judgment. The purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues."[15] Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[16] Under Rule 56(c) "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[17]

**10.** See Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."); see also Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995) (citations omitted) ("A Rule 12(b)(6) dismissal will not be affirmed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ").

**11.** Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998) (quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984)).

**12.** See Baker v. Putnal, 75 F.3d 190, 196 (5th Cir.1996); Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d 627, 629 (5th Cir.1994); see also Jolly v. Klein, 923 F.Supp. 931, 942 (S.D.Tex.1996) ("A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or the merits of the case.").

**13.** See Kaiser, 677 F.2d at 1050 (citing Associated Builders, Inc. v. Alabama Power Co., 505 F.2d 97, 100 (5th Cir.1974)).

**14.** See id.; La Porte Const. Co., Inc. v. Bayshore Nat. Bank of La Porte, 805 F.2d 1254, 1255–56 (5th Cir.1986).

**15.** Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**16.** Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**17.** Fed.R.Civ.P. 56(c); Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548 (noting that, under Rule 56(c), summary judgment is appropriate where it appears from the pleadings, depositions, admissions, and affidavits, that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law).

The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but it need not negate the elements of the non-movant's case.[18] Since the moving party bears the burden of proof, the Court construes the evidence in the opponent's favor and extends him the benefit of all favorable inferences.[19] When the moving party has properly supported his summary judgment motion, the non-moving party must come forward with "significant probative evidence" showing that there is an issue regarding material facts.[20] The nonmovant may not simply rely on "vague assertions that additional discovery will produce needed, but unspecified facts."[21] If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof at trial, then a grant of summary judgment is appropriate.[22] Even if the nonmovant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[23]

## III. DEFENDANT'S OBJECTIONS TO THE DECLARATION OF NARCISO RETANA

Before turning to the merits of Defendant's Motion, the Court considers the objections Defendant has lodged regarding paragraphs four, five, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, and sixteen of Narciso Retana's ("Retana") "Sworn Declaration" ("Declaration"), offered as Exhibit D to Plaintiff's Response. To summarize the basis for Defendant's objections, Defendant asserts that certain aspects of Retana's Declaration are conclusory, irrelevant, immaterial, subjective, speculative, and not based on personal knowledge. After carefully examining Retana's Declaration, the Court enters the following rulings:

(1) Defendant's objection to paragraphs four, eight, nine, ten, and eleven of Retana's Declaration are **OVERRULED**;

(2) Defendant's objections to paragraphs thirteen, fourteen, fifteen, and sixteen are **SUSTAINED**; and

(3) Defendant's objection to paragraph five is **SUSTAINED** to the extent Defendant argues Retana is attempting to inject his own claims of discrimination into Silva's lawsuit, but is otherwise **OVERRULED**.

18. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1990) (quoting Celotex, 477 U.S. at 323, 106 S.Ct. 2548).

19. Reid v. State Farm Mut. Auto. Ins. Co., 784 F.2d 577, 578 (5th Cir.1986).

20. Ferguson v. Natl. Broad. Co., Inc., 584 F.2d 111, 114 (5th Cir.1978).

21. S.E.C. v. Spence & Green, 612 F.2d 896 (5th Cir.1980); see also Celotex, 477 U.S. at 324, 106 S.Ct. 2548 ("Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial."); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986) ("Some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis in original).

22. Celotex, 477 U.S. 317, 321–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

23. Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505.

Having ruled on Defendant's Objections, the Court now considers the merits of Defendant's Motion.

## IV. *SILVA'S TITLE VII DISCRIMINATION CLAIM*

### A. Title VII's Prohibition Against Discrimination in Employment

■ Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private employment.[24] Title 42 U.S.C. § 2000e–16(a)–(e) provides the remedy for claims of employment discrimination perpetrated by federal employees in violation of Title VII.[25] In a case such as this, where the plaintiff has no direct evidence of discriminatory intent,[26] he may rely on circumstantial evidence to support his claim.[27]

■ A court reviews Title VII discrimination claims based on circumstantial evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[28] Under that rubric, the plaintiff must first establish a prima facie case of discrimination prohibited by Title VII.[29] To establish a prima facie case of intentional discrimination under a disparate treatment theory such as Silva advances, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position in question; (3) he was subject to discharge or other adverse employment action; and (4) his employer treated other similarly situated employees outside the plaintiff's protected class more favorably.[30] In the context of Title VII's core anti-discrimination provision, section 703(a), "adverse employment actions" include only employer actions which affect an employee's compensation, terms, conditions, or privileges of employment.[31] In addition, "similarly situated" employees are employees who are treated more favorably in "nearly identical" circumstances.[32] As its phrasing "nearly identical" suggests, the Fifth Circuit narrowly construes the "similarly situated" requirement.[33]

**24.** 42 U.S.C. § 2000e *et seq.*

**25.** *Henderson v. U.S. Veterans Admin.*, 790 F.2d 436, 439 (5th Cir.1986).

**26.** In this context, "direct evidence" is "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.2002) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir.1995)).

**27.** *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000).

**28.** *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir.2004); *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir.2001).

**29.** *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512. In the Title VII context, a "prima facie case" denotes what is required to establish a legally mandatory, rebuttable presumption rather than referring to the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. *Tex.*

**30.** *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512.

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**31.** *See Burlington Northern & Santa Fe Ry. v. White*, —— U.S. ——, 126 S.Ct. 2405, 2409, 2412–13, 165 L.Ed.2d 345 (2006) (explaining that, unlike Title VII's anti-retaliation provision, Title VII's substantive antidiscrimination provision is limited to employer actions affecting the terms and conditions of employment).

**32.** *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir.2005); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995).

**33.** *See Wheeler*, 415 F.3d at 406 (finding insufficiently identical circumstances where the terminated white plaintiff and a black manager who remained employed had the same supervisor, were both company directors, and were both accused of removing company as-

■ The plaintiff's burden at this juncture is merely one of production rather than persuasion.[34] A reviewing court must therefore not engage in a credibility assessment regarding the plaintiff's proffered evidence at this stage.[35] Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer, who must articulate some legitimate, non-discriminatory reason for his actions regarding the plaintiff's employment.[36] The burden on the employer at this stage is similarly one of production rather than persuasion.[37]

■ Significantly, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for discharge.[38] "We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue."[39] Moreover, "the existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."[40]

■ Once the employer provides sufficient evidence to show it predicated the employee's discharge or other adverse employment action on a legitimate, nondiscriminatory reason, the burden of production moves to the plaintiff.[41]

This burden now merges with the burden of persuading the [fact finder, by a preponderance of the evidence,] that she has been the victim of intentional dis-

sets at relatively the same time; the Court of Appeals noted that the white plaintiff lied repeatedly during the course of the company's investigation, while the black employee admitted her actions; in addition, the value of the property the black employee removed was "dramatically less" than the property the white plaintiff removed); *Mayberry*, 55 F.3d at 1090 (finding that the plaintiff had not shown "nearly identical" circumstances merely because he produced evidence that white and black employees in the same position had scrapped parts due to the employee's operator error or poor workmanship, but were not disciplined; the plaintiff had not shown that the undisciplined employees had, like him, a history of poor work performance and scrapped parts damage amounting to $8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991) (concluding that the plaintiff had not shown "nearly identical" circumstances because the employee outside plaintiff's protected class who allegedly received more favorable treatment did not have the same supervisor); *Smith v. Wal–Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir.1990) (determining that the plaintiff and the employee outside her protected class who allegedly received preferential treatment were not similarly situated where the employer discharged the plaintiff because the plaintiff violated its non-fraternization policy and the other employee's conduct did not involve the employer's non-fraternization policy). "[P]ut another way, the conduct [or circumstances] at issue is not nearly identical when the difference between the plaintiff's conduct [or circumstances] and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304–05 (5th Cir.2000) (finding that the "striking differences" between the plaintiff's and purportedly similarly situated employee outside the plaintiff's protected class "more than account[ed] for the different treatment they received.").

34. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

35. *Id.*

36. *Bryan*, 375 F.3d at 360.

37. *Russell*, 235 F.3d at 222.

38. *Little*, 924 F.2d at 97.

39. *Id.*

40. *Id.*

41. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Bryan*, 375 F.3d at 360.

crimination. She may succeed in this either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.[42]

Thus, assuming the plaintiff has established a prima facie case of unlawful age discrimination, to survive a motion for summary judgment, the plaintiff must present circumstantial evidence sufficient to create a material fact issue regarding whether the employer's proffered nondiscriminatory reasons were not its true reasons, but rather a pretext for discrimination on the basis of factors prohibited by Title VII.[43]

B. *Whether Silva Has Established a Prima Facie Case of Title VII Discrimination Under a Disparate Treatment Theory of Liability*

Defendant contends Silva has not established a prima facie case of disparate treatment discrimination under Title VII because Silva has not shown that he suffered an adverse employment action or that the agency treated other similarly situated individuals more favorably. Because both elements are necessary to establish a prima facie case of disparate treatment discrimination under Title VII, Defendant argues Silva's claim must fail as a matter of law. The Court considers the merits of Defendant's arguments below.

**1. Silva Has Satisfied the "Adverse Employment Action" Element of a Prima Facie Disparate Treatment Discrimination Claim Under Title VII**

The Court first considers whether Silva has shown he was subject to an adverse employment action. The agency's refusal to grant Silva's request for a permanent light-duty assignment in the Border Patrol's Electronics Branch represents one of the employment actions in question. Defendant argues Silva's request that the agency reassign him from his regular-duty Electronics Technician position at the Las Cruces shop to a permanent light-duty Electronics Technician position elsewhere in the El Paso Sector—assuming for purposes of argument that a permanent light-duty position existed—represented nothing more than a request for a lateral transfer (*i.e.*, a transfer which does not involve a demotion of form or substance). Defendant asserts that refusing an employee's request for a purely lateral transfer does not qualify as an adverse employment action under Title VII. Silva responds that the practical effect of denying Silva's transfer request was to suspend him from work entirely because the alternative LECA position the agency offered was medically inappropriate. When Silva declined the LECA job on his personal physician's advice, the agency ultimately terminated him. Silva thus argues that both the agency's denial of his transfer request and its decision to remove him from federal service qualify as "adverse employment actions" under Title VII.

Fifth Circuit precedent supports Defendant's position regarding the agency's refusal to transfer Silva to a permanent light-duty position.[44] A transfer to a light-

---

**42.** *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

**43.** *Id.* at 254–55, 101 S.Ct. 1089; *see also* FED.R.CIV.P. 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (explaining that, even if the nonmovant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**44.** *See Banks v. E. Baton Rouge Paris Sch. Bd.,* 320 F.3d 570, 575–76 (5th Cir.2003) (citing *Burger v. Central Apt. Mgmt., Inc.,* 168 F.3d 875, 878–80 (5th Cir.1999), for the proposition that an employer's refusal to grant an

duty assignment in the Electronics Branch would have constituted a purely lateral transfer, as it involved neither a demotion of form nor a one of substance.[45] Therefore, to the extent Silva relies on the agency's refusal to grant his transfer request to establish the "adverse employment action" element of a prima facie disparate treatment discrimination cause of action, his claim fails as a matter of law. However, the agency's refusal to transfer Silva to a permanent light-duty assignment is not the only adverse employment action Silva has asserted. There is no dispute that the agency also discharged Silva, an action which qualifies as an adverse employment action.[46] Silva has thus satisfied the "adverse employment action" element of a disparate treatment discrimination claim to the extent he claims the agency discriminated against him when it removed him from federal service.

## 2. However, Silva Has Not Satisfied the "Similarly Situated" Element of a Prima Facie Disparate Treatment Discrimination Claim Under Title VII

■ To establish a prima facie case of disparate treatment discrimination under Title VII, Silva must also produce evidence that the agency afforded similarly situated individuals better treatment. The circumstances of the allegedly similarly situated individuals must be "nearly identical."[47] The similarly situated individuals who re-

ceived better treatment must also fall outside Silva's protected class.[48]

Here, the record shows Silva worked as an Electronics Technician in the El Paso Sector, Las Cruces division. The agency assigned Silva to work on sensor repeaters. Jerry Estep supervised Silva. Silva injured and re-injured his knees while on the job. Silva filed workers' compensation claims for each injury and workers' compensation paid Silva during his time away from work as a result of his injuries. Following his re-injury, Silva was subject to permanent medical restrictions. Those permanent medical instructions prohibited him from climbing, among other things. After his re-injury, Silva requested a transfer to a permanent light-duty position as an Electronics Technician elsewhere in the El Paso Sector. To satisfy the "similarly situated" element of a prima facie disparate treatment discrimination claim, it is not sufficient for Silva to direct the Court to evidence that certain of his fellow employees received better treatment than he did. Rather, Silva must come forward with evidence regarding agency employees in "nearly identical circumstances" to those described above to allow a meaningful comparison.[49] Then, Silva must demonstrate those employees received preferential treatment at the agency's hands.[50] For the reasons discussed below, the Court finds that Silva has failed to carry his burden of production in this respect.[51]

employee's request for a purely lateral transfer does not constitute an adverse employment action under Title VII).

45. In fact, it appears that transfer to a permanent light-duty assignment would have resulted in a de facto promotion for Silva, as his working conditions would have been less onerous.

46. *Burlington Northern & Santa Fe Ry.*, 126 S.Ct. at 2411–12; *Wheeler*, 415 F.3d at 405.

47. *Wheeler*, 415 F.3d at 406; *Mayberry*, 55 F.3d at 1090.

48. *Wheeler*, 415 F.3d at 399; *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512–13.

49. *Wheeler*, 415 F.3d at 399; *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512–13.

50. *Bryan*, 375 F.3d at 360; *Okoye*, 245 F.3d at 512–13.

51. *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097.

### a. The Employees Silva Identifies as Being "Similarly Situated"

At his deposition, Silva acknowledged he had previously identified the following four individuals and alleged that the Border Patrol afforded them better treatment when they either injured themselves on the job or had a pre-existing injury at the time of hire: (1) Robert Patterson; (2) Jeff English; (3) John Page; and (4) William Carrier.[52] In Silva's Supplemental EEOC Complaint signed on August 24, 2005, Silva stated that Patterson was black.[53] Silva alleged the agency provided Patterson extended light-duty work and created a specific position for him at the Las Cruces Repair Depot.[54] Silva stated that English was white.[55] Silva contended the agency provided English with extended light-duty work after English had elective surgery and was thereafter subject to medical restrictions prohibiting climbing.[56] Silva asserted Page, who was also white, underwent surgery for a torn meniscus.[57] Silva averred that the agency permitted Page to return to work on light duty, although, like English's doctor, Page's physician imposed medical restrictions against climbing.[58] Carrier, another white employee, had a pre-existing hand injury.[59] Silva said the agency hired Carrier despite Carrier's hand injury and allowed him to forego climbing for a year.[60]

Silva's deposition revealed additional information concerning these employees. Page's mother is Mexican and his father is white.[61] Silva insisted that Page did not request a temporary light duty assignment.[62] Rather, Silva emphasized that it was Estep who suggested Page to return to work on light duty.[63] Silva testified that Estep instructed Silva to call Page and tell Page to return to work on light duty working solely on radios and walkie-talkies.[64] Silva said Page refused because Page did not believe Estep would actually limit his work to light-duty tasks.[65] Page therefore told Silva he would wait until his knee did not hurt before returning to work.[66] Silva also stated that Page merely took sick leave after he had his knee surgery, unlike Silva, whose time off to recover came pursuant to a worker's compensation claim.[67] Silva admitted that he had "no idea" whether Page ever requested a permanent light-duty assignment.[68]

---

52. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 107–10. Silva named these four individuals in his Supplemental Complaint to the EEOC, signed on August 24, 2005. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 28 at 7.

53. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 28 (Silva's Supp. EEOC Compl.) at 7.

54. Id.

55. Id.

56. Id.

57. Id.

58. Id.

59. Id.

60. Id.

61. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 65.

62. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 107–08.

63. Id.

64. Id.; Pl.'s Resp., Rec. No. 26, Ex. A (Silva Depo.) at 54.

65. Pl.'s Resp., Rec. No. 26, Ex. A (Silva Depo.) at 54.

66. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 107–08; Pl.'s Resp., Rec. No. 26, Ex. A (Silva Depo.) at 54.

67. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 107–08.

68. Id. at 108.

Silva testified that Carrier and English, while also Electronics Technicians, worked in the El Paso shop and were supervised by an individual named Bill Barber rather than by Estep.[69] Silva stated that he had "no idea" whether Carrier's condition ("a cut hand") was permanent or what kind of accommodation Carrier requested.[70] Silva recalled that English's elective surgery was on his leg, but said he had "no idea" whether English requested a permanent accommodation.[71]

Silva testified that Patterson "worked at Las Cruces" but Silva could not recall whether Patterson "retired from Las Cruces, or he came to work in El Paso afterwards." [72] Silva stated that Estep supervised Patterson while Patterson worked in Las Cruces.[73] Although Silva remembered that Patterson had a knee injury, Silva again said he had "no idea" whether Patterson requested a permanent accommodation.[74]

Through Narciso Retana's Sworn Declaration, Silva also offers evidence that the agency granted Electronics Technician Ed Hernandez's request for a temporary light duty assignment.[75] Retana states that Hernandez worked in the El Paso shop under Retana's supervision.[76] After Hernandez filed a workers' compensation claim for an injury he sustained outside the workplace, Retana says, the agency allowed Hernandez to work at the agency's Camera Depot in Las Cruces for four months.[77] Retana states that Hernandez "would report to the El Paso Electronics Branch at his regular start time and would

then travel to Las Cruces in a government car, to report to the Camera Depot." [78]

Retana also states that Electronics Technicians Miguel Rodriguez and George Mendez "refused to climb towers to repair radio equipment because of their injuries. In their situation, outside contractors were hired by the government in order to accommodate [them]." [79]

b. *Discussion*

 After carefully reviewing the evidence, the Court concludes that Silva has not shown Patterson, Page, English, Carrier, Hernandez, Rodriguez, or Mendez were "similarly situated" to him and therefore has failed to set forth the final element required to establish a prima facie case of disparate treatment discrimination under Title VII. Silva has come forward with no evidence that any of these individuals were, like Silva, subject to permanent medical restrictions. Further, Silva has presented no evidence to show that any of these five employees except Hernandez actually requested a transfer to a light duty assignment, much less a transfer to a permanent light duty assignment. It is additionally clear that Hernandez's request was only for a temporary accommodation and resulted for an injury which occurred outside the scope of his employment. Further, while arguably not dispositive, Hernandez's, Rodriguez's, and Mendez's surnames very strongly suggest that they did not fall outside of Silva's Title VII-protected class (*i.e.*, race or national origin). There is similarly evidence to suggest that

69. *Id.* at 108–10.

70. *Id.* at 109.

71. *Id.* at 110.

72. *Id.*

73. *Id.*

74. *Id.*

75. Pl.'s Resp., Rec. No. 26, Ex. D (Retana Decl.) at ¶ 8.

76. *Id.*

77. *Id.*

78. *Id.*

79. *Id.* at ¶ 11.

Page did not fall outside Silva's protected class due to his mixed parentage. Moreover, only Page and Patterson were, like Silva, supervised by Estep. Page and Patterson are also the only individuals Silva names who also worked in the Las Cruces electronics shop. In addition, Silva has only provided evidence that his own and Page's injuries occurred while on the job. Given the dissimilarity in circumstances between these individuals and Silva, the Court concludes that Silva has not established the final element required to set forth a prima facie case of disparate treatment discrimination under Title VII. The Court will therefore **GRANT** Defendant's Motion inasmuch as Defendant asserts Silva fails to set forth a prima facie Title VII claim.

## V. *SILVA'S ADEA DISCRIMINATION CLAIM*

### A. *Unlawful Age Discrimination Under the ADEA*

 The ADEA prohibits age discrimination in federal employment, making it illegal for an employer to discharge any individual because of his age.[80] The ADEA's protected class is limited to individuals who are at least 40 years of age or older.[81] Where, as here, a plaintiff seeks to prove his age discrimination claim through indirect evidence, courts in this Circuit apply an "integrated" or "modified *McDonnell Douglas*" approach.[82] Pursuant to this integrated approach, a plaintiff must demonstrate a prima facie case of

discrimination prohibited by the ADEA.[83] The defendant must then articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff.[84] If the defendant meets its burden of production, the plaintiff must thereafter offer sufficient evidence to create a genuine issue of material fact

either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative). If a plaintiff demonstrates that age was a motivating factor in the employment decision, it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of the discriminatory animus. If the employer fails to carry this burden, plaintiff prevails.[85]

Significantly, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for discharge.[86] "We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue."[87] Moreover, "the existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."[88] "The

---

**80.** 29 U.S.C. § 623(a)(1); *Machinchick v. P.B. Power, Inc.,* 398 F.3d 345, 352 n. 22 (5th Cir.2005); *Bodenheimer v. PPG Indust.,* 5 F.3d 955, 957 (5th Cir.1993).

**81.** 29 U.S.C. § 631(a); *Machinchick,* 398 F.3d at 352 n. 22.

**82.** *Machinchick,* 398 F.3d at 352; *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 311 (5th Cir.2004).

**83.** *Machinchick,* 398 F.3d at 352.

**84.** *Id.*

**85.** *Id.* (quoting *Rachid,* 376 F.3d at 312).

**86.** *Little,* 924 F.2d at 97.

**87.** *Id.*

**88.** *Id.*

ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.' " [89]

### B. Discussion

■ The heart of Defendant's argument is that Silva cannot satisfy the "adverse employment action" or "similarly situated" elements required to establish a prima facie case of age discrimination. After review, the Court does not find Defendant's argument regarding the "adverse employment action" persuasive. As the Court discussed in regard to Silva's Title VII discrimination claim, although the agency's denial of Silva's request for a transfer to a permanent light-duty position does not qualify as an "adverse employment action," Silva's ultimate removal from federal service certainly does. Therefore, the Court finds that Silva has satisfied the "adverse employment action" element of a prima facie age discrimination claim to the extent he presents evidence of his termination. The Court now considers whether Silva has produced evidence that the agency replaced him with an individual under the age of 40; replaced him with someone over the age of 40, but younger than Silva; or otherwise discharged him due to his age.[90]

Here, Silva has not presented any evidence that the agency replaced him with an individual under the age of 40 or someone over 40 years of age but younger than Silva.[91] In the absence of any such evidence, the Court must assume that Silva hopes to establish the final element of his prima facie age discrimination claim by relying on evidence that the agency "otherwise discharged" Silva because of his age. In this regard, Silva directs the Court to evidence which, according to him, supports a finding that the agency treated John Page and Robert Patterson, younger Electronics Branch employees who suffered on-the-job injuries, better than it treated Silva. After reviewing the pleadings and attached exhibits, however, the Court finds Silva has not produced evidence that Page and Patterson were actually "similarly situated."

■ To establish a claim of disparate treatment, Silva must show that the agency gave preferential treatment to a younger employee under nearly identical circumstances.[92] While there is evidence in the record to support a finding that Jerry Estep supervised Patterson, Page, and Silva, the similarities in their situations end there. Although Silva has produced evidence that Page and Patterson suffered injuries while on the job which rendered them subject to medical restrictions, there is no evidence Page's and Patterson's restrictions were permanent, as Silva's were, or that either worker requested a transfer to a permanent, light-duty assignment in the Electronics Branch, as Silva did. Thus, Silva has not shown that the younger employees he names were in "nearly identical" circumstances. Because the Court concludes that Silva has failed to

---

**89.** *Bienkowski v. American Airlines,* 851 F.2d 1503, 1507–08 (5th Cir.1988).

**90.** *Bodenheimer,* 5 F.3d at 957; *Fields v. J.C. Penney Co.,* 968 F.2d 533, 536 & 536 n. 2 (5th Cir.1992).

**91.** Although evidence in the record shows an individual named "George Lee" eventually filled Silva's position in the Las Cruces shop, neither Party directs the Court to any information concerning Lee's age.

**92.** *Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304–05 (5th Cir.2000); *Little,* 924 F.2d at 97.

establish a prima facie case of age discrimination under the ADEA, it will grant Defendant's Motion on this point. The Court's resolution of this issue moots Defendant's argument that Silva is not entitled to a jury trial concerning his ADEA claim.

## VI. SILVA'S REHABILITATION ACT CLAIMS

Silva alleges the agency violated the Rehabilitation Act of 1973 ("the Act") when it failed to provide a reasonable accommodation for his actual physical disability and later discharged him from federal service. Alternatively, Silva contends the agency discriminated against him because it erroneously considered him disabled.

As to Silva's claim that the agency failed to make a reasonable accommodation for his disability, Defendant argues Silva cannot establish a prima facie case because he is neither "qualified" nor actually "disabled" within the Act's meaning. Regarding Silva's claim that the agency "regarded him as disabled," Defendant asserts Silva did not raise this theory of liability before the EEOC and is therefore precluded from raising it in his Complaint. Defendant further contends that, even assuming Silva's "regarded as disabled" theory is properly before the Court, it must fail because Silva has not established a prima facie case. That is, Defendant avers Silva cannot, as a matter of law, establish that the agency "regarded [him] as disabled." Defendant additionally asserts the agency is

entitled to summary judgment on this issue because no reasonable jury, viewing the evidence in Silva's favor, could return a verdict in Silva's favor on this point.

Before reaching the merits of Defendant's arguments, the Court considers the legal standard governing claims of discrimination under the Act.

### A. Unlawful Disability Discrimination Under the Rehabilitation Act

The Rehabilitation Act of 1973, as amended in 1978, gives federal employees a private cause of action for disability discrimination allegedly perpetrated by the federal government or its agencies:

> No otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[93]

This private cause of action for alleged Rehabilitation Act violations is subject to the same procedural constraints, including the administrative exhaustion requirement, set forth in Title VII.[94]

### 1. Exhaustion Requirement

 Under Title VII's legislative scheme, which also governs Rehabilitation Act claims, federal employees must first

---

**93.** 29 U.S.C. § 794(a); *see Doe v. Garrett,* 903 F.2d 1455, 1459 & 1459 n. 6 (11th Cir.1990) (noting that § 794(a) is often referred to as "section 504" of the Rehabilitation Act, according to the section designation in the original legislation); *Prewitt v. United States Postal Service,* 662 F.2d 292, 304 (5th Cir. Unit A Nov.5, 1981) (recounting the Rehabilitation Act's legislative history and stating that "in summary, the 1978 amendments to the Rehabilitation Act 1) established a private right of

action, subject to the same procedural constraints (administrative exhaustion, etc.) set forth in Title VII of the Civil Rights Act, in favor of section 501 claimants, and 2) extended section 504's [presently section 794(a)] proscription against handicap employment discrimination to cover the activities of the federal government itself.").

**94.** *Prewitt,* 662 F.2d at 304.

exhaust their administrative remedies before initiating a disability discrimination suit in federal district court.[95] Nonetheless, "the 'scope' of the judicial complaint is limited [only] to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." [96] In other words, an employee's Rehabilitation Act claims in federal court are not limited solely to the specific claim or claims the employee made in his initial EEOC charge.[97] The employee may also raise claims based upon any kind of discrimination which is similar or related to the initial EEOC charge's allegations, so long as the EEOC investigation could reasonably have been expected to encompass the additional theory of liability.[98] Courts examine all the information presented to the agency to determine what allegations would reasonably be expected to grow from the agency's investigation.[99] This is because "the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation." [100] The court's determination of the lawsuit's proper scope is driven by the competing policies of promoting the "voluntary settlement of all issues without an action in the District Court" [101] and expanding the scope of the lawsuit to recognize "the remedial and humanitarian underpinnings of [Title VII]." [102]

**95.** *Id.; see Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 828–29, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (stating that Title VII's administrative exhaustion requirement is an absolute prerequisite to suit); *Pacheco v. Rice,* 966 F.2d 904, 905 (5th Cir.1992) (explaining that, under Title VII's legislative scheme, federal employees must first exhaust their administrative remedies before they may bring suit in federal court); *Hampton v. I.R.S.,* 913 F.2d 180, 182 (5th Cir.1990) ("Before a federal employee may bring an employment-discrimination suit in federal court, he must first exhaust available administrative remedies."); *Porter v. Adams,* 639 F.2d 273, 276 (5th Cir. March 1981) (noting that administrative exhaustion is "an absolute prerequisite" to suit under 42 U.S.C. § 2000e–16).

**96.** *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970).

**97.** *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995) (*overruled in part on other grounds by Burlington N. and Santa Fe Ry. Co.,* —— U.S. at ——, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006)) (observing that "[t]he filing of an administrative complaint is ordinarily a jurisdictional prerequisite to a Title VII action" but noting the litigant may raise claims in his federal complaint based on any kind of discrimination like or related to the charges in his initial EEOC charge); *Fine v. GAF Chem. Corp.,* 995 F.2d 576, 577–78 (5th Cir.1993) (noting the same exception); *Estate of Martineau v. ARCO Chem. Co.,* 203 F.3d 904, 913 (5th Cir.2000) ("A Title VII hostile work environment claim may be based on claims that 'could reasonably be expected to grow out of the initial charges of discrimination.' "); *Clark v. Kraft Foods, Inc.,* 18 F.3d 1278, 1280 (5th Cir.1994) (explaining that the applicable standard "is not the scope of actual investigation but what we reasonably would expect the EEOC to investigate."); *Sanchez,* 431 F.2d at 466 ("[T]he 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

**98.** *See Dollis,* 77 F.3d at 781; *Estate of Martineau,* 203 F.3d at 913; *Clark,* 18 F.3d at 1280; *Sanchez,* 431 F.2d at 466.

**99.** *See Clark,* 18 F.3d at 1280 n. 9. "Neither the verbatim allegations of the EEOC charge nor the actual scope of the EEOC's investigation will determine the limits of a plaintiff's civil complaint." *Williams v. Simmons Co.,* 185 F.Supp.2d 665, 681(N.D.Tex.2001) (citing *Clark,* 18 F.3d at 1280). Thus, the failure of the EEO investigator to investigate a particular claim not explicitly raised will not necessarily preclude judicial consideration of the claim. *See Clark,* 18 F.3d at 1280.

**100.** *Sanchez,* 431 F.2d at 466.

**101.** *Id.* at 461.

**102.** *Id.* at 467.

## 2. Establishing a Prima Facie Case Under the Rehabilitation Act

To determine whether a federal agency has violated the Rehabilitation Act's prohibitions, the Court applies "the standards set forth in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 *et seq.*, and the provisions of sections 501 through 504, and 510 [42 U.S.C. §§ 12201–12204 and 12210], of the Americans with Disabilities Act of 1990, as such sections relate to employment." [103] Through the standards set forth in the ADA, the Rehabilitation Act recognizes three distinct theories of "disability," only two of which are relevant to the case at bar. [104] First, an employee may show that his employer discriminated against him on the basis of an actual "disability." [105] A "disability" for purposes of the ADA and the Rehabilitation Act is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." [106] Alternatively, an employee may prevail by showing his employer discriminated against him because the employer *regarded* the employee as suffering from a physical or mental impairment which substantially limits one or more of the employee's major life activities. [107]

### a. McDonnell Douglas's Burden Shifting Analysis Applies

The *McDonnell Douglas* burden shifting analysis applies to Rehabilitation Act claims. [108] Under that framework, the plaintiff must establish a prima facie case of disability discrimination. [109] The burden then shifts to the defendant, who must produce evidence of a nondiscriminatory reason for the adverse employment action. [110] If the defendant meets his burden of production, the burden returns to the plaintiff, who must show the defendant's proffered nondiscriminatory justification is merely a pretext for illegal disability discrimination. [111]

### b. Prima Facie Case Under Alternate Theories of "Disability"

To set forth a prima facie claim for relief under the Act, a plaintiff must

103. 29 U.S.C. § 794(d).

104. *See* 42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

105. 42 U.S.C. § 12102(2)(A); *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139.

106. 42 U.S.C. § 12102(2)(A).

107. 42 U.S.C. § 12102(2)(C).

108. The Fifth Circuit has not explicitly applied the *McDonnell Douglas* framework to discrimination claims brought under the Rehabilitation Act. However, every other circuit court of appeals except the First and Eleventh Circuits have done so. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–50 (2d Cir.2002); *Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir.1996); *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir.1995); *Burns v. City of Columbus, Dep't of Pub. Safety, Div.*

*of Police*, 91 F.3d 836, 843–44 (6th Cir.1996); *Tyler v. Runyon*, 70 F.3d 458, 467 (7th ·Cir. 1995); *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir.2004); *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1175–76 (9th Cir.1998) (per curiam); *Williams v. Widnall*, 79 F.3d 1003, 1005 n. 3 (10th Cir.1996); *McGill v. Munoz*, 203 F.3d 843, 845 (D.C.Cir.2000). In addition, in at least one unpublished opinion, the Fifth Circuit has noted the other circuit decisions on this issue and indicated that it would apply the *McDonnell Douglas* framework to Rehabilitation Act claims if the issue were squarely before it. *See Handy v. Brownlee*, No. 04–50545, 2004 WL 2980347, *3 n. 3; 2004 U.S.App. LEXIS 27065, *8 n. 3 (5th Cir. Dec. 22, 2004).

109. *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817.

110. *Id.*

111. *Id.*

show that: (1) he is an individual with a disability within the meaning of the statute; (2) who is otherwise qualified to perform the duties of his position; (3) worked for a program or activity receiving federal assistance or for a federal agency;[112] and (4) suffered an adverse employment action solely because of his disability.[113] As Defendant challenges Silva's contention that he is an "individual with a disability" and "otherwise qualified" within the Act's meaning, the Court examines these terms in greater detail.

### i. Actual "Disability"

As noted previously, an "individual with a disability" under the Act includes any person who has "a physical or mental impairment[114] which substantially limits one or more of the person's major life activities";[115] or who "is regarded as having such an impairment."[116] Courts should strictly interpret the terms "major life activity" and "substantial impairment" to "create a demanding standard for qualifying as disabled."[117]

"Merely having an impairment does not make one disabled" for purposes of the Act.[118] Rather, the plaintiff must demonstrate that he is impaired to such a degree that the deficiency substantially limits his "major life activities."[119] Applicable regulations define "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[120] The list is non-exhaustive; other major life activities can include lifting, reaching, sitting, or standing.[121]

A physical or mental impairment "substantially limits" a major life activity if it renders the individual either: (1) "unable to perform a major life activity that the average person in the general population can perform" or (2) "significantly restrict-

---

**112.** *Prewitt,* 662 F.2d at 304.

**113.** *Hileman v. City of Dallas,* 115 F.3d 352, 353 (5th Cir.1997); *Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993).

**114.** 29 U.S.C. § 705(20)(B)(I). The Rehabilitation Act regulations issued by the Department of Health, Education, and Welfare ("HEW") define a "physical or mental impairment" as:

(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
45 C.F.R. § 84.3(j)(2)(i) (2007).

**115.** 29 U.S.C. § 705(20)(B)(i).

**116.** 29 U.S.C. § 705(20)(B)(iii). The Rehabilitation Act regulations issued by HEW define "regarded as having an impairment" as:

"(A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient [of federal funds] as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) has none of the impairments defined in paragraph (j)(2)(I) of this section but is treated by a recipient [of federal funds] as having such an impairment."
45 C.F.R. § 84.3(j)(2)(iv) (2007).

**117.** *Toyota Motor Mfg., Ky. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

**118.** *Id.* at 195, 122 S.Ct. 681.

**119.** *Id.*

**120.** 45 C.F.R. § 84.3(j)(2)(ii) (2007).

**121.** *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 n. 7 (5th Cir.1995).

ed as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." [122] "Whether an impairment substantially limits a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." [123] "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." [124] "Temporary, non-chronic impairments of short duration, with little or no permanent long-term impact, are usually not disabilities." [125]

■ In making the "substantially limited" determination, courts should first examine whether an individual is substantially limited with regard to a major life activity other than working. [126] If the court finds no such limitation, then it should determine whether the individual is substantially limited with regard to the major life activity of working. [127] With regard to the activity of working, "substantially limits:"

> means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working. [128]

### ii. Perceived "Disability"

■ "Individuals who are 'regarded as' having a disability are disabled within the meaning of the ADA." [129] There are two apparent ways in which individuals may fall within this statutory definition:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "result from stereotypic assumptions not truly indicative of . . . individual ability." [130]

### iii. "Otherwise Qualified"

■ To determine whether an employee is "otherwise qualified," a court conducts a two-step inquiry. [131] First, the court must determine whether the employee can perform the core functions of his job. [132] If the employee cannot perform the

---

**122.** *Id.* at 757 n. 8 (citing 29 C.F.R. § 1630.2(j)(1)(i)).

**123.** *Id.* at 757.

**124.** *Williams,* 534 U.S. at 200–01, 122 S.Ct. 681.

**125.** *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1051 (5th Cir.1998).

**126.** *Dutcher,* 53 F.3d at 726 & 726 n. 10.

**127.** *Id.* at 726–27.

**128.** *Id.* at 727.

**129.** *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

**130.** *Id.*

**131.** *Chandler,* 2 F.3d at 1393.

**132.** *Id.*

core functions of his position, the court must next ask whether a reasonable accommodation would enable the employee to do so.[133] It is the plaintiff's burden to show that he is otherwise qualified.[134] It is likewise the plaintiff's burden to show that his requested accommodations were reasonable.[135]

"The definition of a qualified handicapped individual ... includes a personal safety requirement."[136] An "otherwise qualified handicapped individual" is defined as one "who 'can perform the essential functions of the position in question without endangering the health and safety of the individual or others.'"[137] Under § 794(a) of the Act, "an individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or could injure others, and the employer cannot modify the job to eliminate that risk."[138]

### B. Silva's Injury

The Court first considers whether Silva has set forth a prima facie case of discrimination under his reasonable accommodation theory of liability. As a threshold inquiry, the Court must determine whether Silva was physically "disabled" within the meaning of 42 U.S.C. § 12102(2)(A) at the time of his discharge. The Court therefore examines the nature of Silva's injury and extent of impairment it has caused him.

Silva suffers from a injured knee. In a "Work Capacity Evaluation" dated September 3, 2002, Silva's personal physician, Dr. Richard Westbrook, notified the agency that Silva could return to work subject to permanent restrictions consisting of no more than two hours per shift sitting, six hours walking, six hours standing, one hour squatting, and no climbing mountains or towers.[139] The Office of Workers' Compensation Claims ("OWCP") arranged for Dr. Randy J. Pollet to examine Silva and render a second opinion.[140] Dr. Pollet issued a report dated September 25, 2002.[141] Therein, Pollet asserted Silva could return to work with no restrictions, but recommended Silva engage in a walking and weight loss program.[142]

The OWCP requested Dr. Rene Arrendondo to perform a second independent medical evaluation of Silva's condition.[143] In his report issued on March 12, 2003, Dr. Arredondo stated Silva was capable of working a six-to-eight-hour shift, with the following permanent restrictions: no climbing; no squatting for more than four

133. *Id.* at 1393–94.

134. *Id.* at 1394.

135. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 n. 4 (5th Cir.1997); *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 859 (5th Cir.1993); *but see Prewitt v. United States Postal Serv.*, 662 F.2d 292, 308 (5th Cir.1981) (stating that the employer has the burden of persuasion on the issue of reasonable accommodation).

136. *Chandler*, 2 F.3d at 1393.

137. *Id.* (internal citation omitted).

138. *Id.*

139. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 1 (Excerpts from OWCP File) at 205. Defendant asserts that Dr. Westbrook also stated Silva could "do bench work where he can stand and move around occasionally." Def.'s Mot. to Dismiss, Rec. No. 22, Addendum—St. of Facts, at ¶ 14. The Work Capacity Evaluation, however, does not appear to include any such notation.

140. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 1 (Excerpts from OWCP File) at 223–218.

141. *Id.*

142. *Id.*

143. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 1 (Excerpts from OWCP File) at 287–77.

hours; no walking for more than six hours; and limitations on the amount of weight he could push, pull, or lift.[144] Dr. Arredondo predicted "a full and complete recovery [wa]s probably not feasible" and recommended Silva "not be subjected to climbing high radio towers because he might be in danger of losing his footing [and] falling from the tower and being an obvious danger to himself or others in this regard." [145]

A report from Dr. Westbrook dated October 5, 2004 reveals that, after his removal from federal service, Silva complained of discomfort in his right knee caused by activity.[146] Another report prepared by Dr. Westbrook, dated September 13, 2005, states Silva continued to have pain in his right knee and had attempted a walking program but the program made his knee swell.[147] According to a December 13, 2005 report prepared by Dr. Westbrook, Silva's condition had not changed.[148]

### C. Whether Silva's Impairment Substantially Interfered with Major Life Activities Other Than Working

Silva testified that he can dress himself, drive, and otherwise provide for his daily needs.[149] His own statements therefore weigh against a finding that his knee injury substantially interferes with major life activities other than working. Nonetheless, the permanent medical restrictions noted above suggest Silva is impaired to a certain degree in his ability to sit, stand, walk, and squat. Sitting, standing, and walking are considered major life activities under regulations interpreting the ADA.[150] The Court will also assume for purposes of argument that squatting is also a major life activity, as it implicates an individual's ability to move to a sitting or standing position.[151]

Be that as it may, the Court remains mindful of the demanding standard for qualifying as disabled and concludes Silva does not meet it.[152] The Court in no way intends to minimize whatever discomfort and inconvenience Silva's knee injury caused him. Nevertheless, the Court notes that the injury did not leave Silva completely unable to sit, stand, walk, or squat. While total inability to perform a major life activity may not be required in order to meet the "substantially limits" standard, the Court finds Silva's degree of impairment does not rise to the requisite level. In sum, the Court finds Silva has failed to show that, at the time of his removal, he was unable to perform a major life activity other than working (i.e., sitting, standing, walking, or squatting) that the average person in the general population could perform.[153] The Court likewise concludes Silva has likewise failed to show his impairment significantly restricted the condition, manner or duration under which he could sit, stand, walk, or squat as compared to the condition, manner, or dura-

144. *Id.* at 283.

145. *Id.* at 284.

146. *Id.* at 19–20.

147. *Id.* at 28–29.

148. *Id.* at 25–26.

149. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 6.

150. 45 C.F.R. § 84.3(j)(2)(ii)(2007); *Dutcher,* 53 F.3d at 726 n. 7.

151. Climbing, however, is not a "major life activity." *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 n. 2 (5th Cir.1996) (determining as a matter of law that climbing does not constitute a major life activity under the ADA).

152. *Williams,* 534 U.S. at 197, 122 S.Ct. 681.

153. *Dutcher,* 53 F.3d 723 at 757 n. 8 (citing 29 C.F.R. § 1630.2(j)(1)(i)).

tion under which the average person in the general population could perform these same activities.[154]

### D. Whether Silva's Impairment Substantially Limits the Major Life Activity of Working

Having determined that Silva's knee injury does not substantially limit him in any major life activity other than working, the Court now considers whether Silva's injury substantially limits him in the major life activity of working. As the Court has previously noted, with regard to the activity of working, "substantially limits:"

> means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working.[155]

Here, Silva argues that the only job his impairment precluded him from performing was the LECA position the agency offered him as an accommodation after it concluded Silva could not perform the essential functions of an Electronics Technician. Silva does not argue or introduce evidence that his injury restricted him from an entire class of jobs or a broad range of jobs in various classes. In fact, the record shows that in 2005, the year after the agency terminated Silva, Silva worked for the Department of the Army participating in war games.[156] Silva

agreed that the job was "pretty physical."[157] Silva stated that he and his colleagues lived in the desert for five to six months, pretending to be Arabs assaulting the soldiers.[158] Among other things, Silva and his colleagues pretended to ambush trucks and "mob[bed] and assault[ed] the front gate" of a mock United States embassy.[159] Considering this evidence, the Court concludes Silva's knee injury does not substantially limit him with regard to the major life activity of working.

In sum, the Court finds that Silva has not established that he qualifies as "disabled" under 42 U.S.C. 12102(2)(A). Accordingly, Silva has not established a prima facie case of disability discrimination to the extent he argues the agency discriminated against him on the basis of an actual disability which substantially affected his ability to perform one or more major life activities. The Court's conclusion makes it unnecessary to consider whether Silva was "otherwise qualified" for an Electronics Technician position. Alternatively, even assuming Silva could establish a prima facie case that the agency discriminated against him on the basis of his actual physical disability, the Court finds Defendant would be entitled to summary judgment on this claim because no reasonable jury could return a verdict in his favor based on the evidence presented.[160]

### E. Whether Silva Administratively Exhausted His "Regarded as Disabled" Claim

As a jurisdictional predicate, Silva had to exhaust his administrative remedies for the claims advanced in this action.[161] As

---

154. *Id.* at 757 n. 8 (citing 29 C.F.R. § 1630.2(j)(1)(i)).

155. *Williams,* 534 U.S. at 187, 122 S.Ct. 681.

156. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 6.

157. *Id.* at 7.

158. *Id.*

159. *Id.*

160. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

161. *Brown,* 425 U.S. at 828–29, 96 S.Ct. 1961; *Prewitt,* 662 at 304; *Pacheco,* 966 F.2d at 905; *Hampton,* 913 F.2d at 182; *Porter,* 639 F.2d at 276.

noted, however, there is one exception to this exhaustion requirement.[162] Silva may base a Rehabilitation Act cause of action not only on the specific claims he made in his EEOC charge, but also upon any kind of "like or related" discrimination claim the EEOC charge's allegations would reasonably have supported.[163] · At issue in this case is whether Silva's "regarded as disabled" claim falls within this exception. The Court must therefore examine Silva's Complaint in light of the charges he filed in his administrative action to determine whether he satisfied the jurisdictional prerequisite.[164]

### 1. Silva's Initial EEOC Complaints and Supplemental Filing

Silva filed a discrimination complaint with the Office of Equal Employment Opportunity on July 3, 2003.[165] Therein, Silva alleged the agency had discriminated against him on the basis of race (mestizo/non-white); his age (52 years), national origin (Mexican–American); and physical disability.[166] In an attachment to his initial EEOC filing, Silva explained:

> I believe that I am being discriminated against because of the repeated and ongoing refusal to grant me a transfer to the Electronics Branch in El Paso, Station 1. My request came as part of a request for a reasonable accommodation to my disability (sustained as a work-related injury). There is light duty work available for me at the Electronics Branch, and because of that, my request for a transfer was initially granted. However, my supervisor, Jerry Estep (white), intervened and went out of his

way to ensure that the transfer request was ultimately denied.

> Mr. Estep does not honor the work restrictions imposed by doctors, leading to additional injuries or aggravation of pre-existing injuries.

> After I began to advocate for myself, and to oppose the agency's discrimination, the agency has intensified its efforts to get rid of me. Most recently, on July 1, 2003, I was informed by Kathy McClelland, whose title is unknown to me, that if I did not returns to my job that my workman's compensation benefits would be terminated and that I would lose my job. Ms. McClelland also stated that the agency refuses to accommodate me because they do not want to create a "precedent" of accommodating employees with work restrictions.[167]

Silva amended his EEOC complaint on April 7, 2004.[168] Therein, Silva additionally alleged the agency terminated him due to his national origin (Mexican–American), age (52 yrs.), physical disability (his injured knee), and in reprisal for his previous participation in the EEOC process.[169]

### 2. Discussion

After due consideration, the Court concludes that Silva did not administratively exhaust his "regarded as disabled" claim and is therefore precluded from raising it for the first time before this Court. Besides his allegations of race, age, and national origin-based animus, Silva's initial and supplemental EEOC filings describe only his physical disability and the agen-

---

162. *Dollis,* 77 F.3d at 781.

163. *Id.*

164. *Clark,* 18 F.3d at 1280.

165. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 27 (Silva's Compl. of Discrimination and associated documents) *passim.*

166. *Id.* at 1.

167. *Id.* at 2.

168. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 28 (Excerpts from EEOC Supp. Rep't on Investigation) at 23–24.

169. *Id.* at 3–4.

cy's alleged failure to provide a reasonable accommodation for it. Silva's allegations do not present a sufficient factual predicate such that one would reasonably expect the EEOC to have investigated a "regarded as disabled claim"; nothing in Silva's filings suggests the agency misperceived the nature of his injury or its effect on his ability to engage in major life activities.[170]

■ The Court notes that even if Silva's "regarded as disabled" claim were properly before it, the Court would find Defendant entitled to summary judgment on this issue. Based on the uncontroverted evidence in the record, the agency made repeated, genuine efforts to transfer Silva to a position the agency believed would not aggravate Silva's knee injury further. "An employer's belief that an employee is unable to perform one task" such as the essential duties of an Electronic Technician "does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general."[171] For these reasons, the Court will grant Defendant's Motion as to Silva's Rehabilitation Act claims.

## VII. SILVA'S RETALIATION CLAIM

### A. Legal Standard for Retaliation Claims

As well as prohibiting employment discrimination, Title VII proscribes retaliation against an employee because he opposes an unlawful employment practice. The *McDonnell Douglas* burden-shifting scheme which applies to Title VII disparate treatment claims also applies to claims an employer retaliated against an employee for engaging in activities protected by Title VII.[172] The *McDonnell Douglas* framework similarly applies to claims that an employer retaliated against an employee for challenging employment practices the ADEA, ADA (and therefore the Rehabilitation Act) prohibit.[173]

■ Thus, under *McDonnell Douglas*'s framework, once a plaintiff establishes a prima facie case of unlawful retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.[174] If the defendant introduces evidence which, if true, would permit the fact finder to conclude that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question: whether the defendant unlawfully retaliated against the plaintiff.[175] In other words,

---

170. *See Clark,* 18 F.3d at 1280 (concluding an employee's EEOC charge, stating her claims as "(1) I was harassed because of my sex, female [and] (2) I was sexually harassed," presented a sufficient factual predicate upon which one would reasonably expect the EEOC to investigate both a sexual harassment claim and a disparate treatment claim when read in conjunction with her accompanying affidavit alleging that her employer required female employees on her line "to bust off their job and take lower bracket pay jobs" and fired her shortly after she refused to do so); *see also Sutton,* 527 U.S. at 489, 119 S.Ct. 2139 (explaining the nature of a "regarded as disabled" claim).

171. *See Chandler,* 2 F.3d at 1393.

172. *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983).

173. *Holtzclaw v. DSC Communications Corp.,* 255 F.3d 254, 260 (5th Cir.2001) ("Retaliation claims are nothing more than a protection against discrimination based on the employee's exercise of a right to charge, testify, assist, or participate in a protected activity under the ADEA."); *Sherrod v. American Airlines,* 132 F.3d 1112, 1122 (5th Cir.1998) (finding the district did not err by applying the *McDonnell Douglas* burden-shifting analysis to unlawful retaliation claim under the ADA or ADEA).

174. *Long,* 88 F.3d at 304; *McMillan,* 710 F.2d at 1116.

175. *Long,* 88 F.3d at 304; *McMillan,* 710

the plaintiff must " 'adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation.' " [176]

■■■ To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) he engaged in an activity protected by Title VII, the ADEA, or the Rehabilitation Act; (2) he was subject to an adverse employment action; and (3) there is a causal link between the plaintiff's participation on the protected activity and the adverse employment action.[177] Here, in contrast to Title VII's substantive anti-discrimination provision, "actionable retaliation is not limited to so-called 'ultimate employment actions'" such as hiring, granting leave, discharging, promoting, and compensating.[178] Nonetheless, Title VII's anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." [179] Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." [180] It is not Title VII's purpose to "set forth a general civility code for the American workplace." [181] Rather, Title VII's anti-retaliation provisions seek to prevent an employer from interfering with an employee's unfettered access to the legislation's remedial mechanisms.[182] "It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." [183]

■■■ While the Court must evaluate the materiality of an alleged retaliatory action from the standpoint of a reasonable employee, using an objective standard, it must bear in mind that the significance of any given act of retaliation will often de-

---

F.2d at 1116. As the *Long* Court explained, the ultimate issue in an unlawful retaliation case (*i.e.*, whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII) initially seems identical to the third element of the plaintiff's prima facie case (*i.e.*, whether a *causal* link exists between the adverse employment action and the protected activity). 88 F.3d at 305 n. 4. However, the ultimate issue and the third element of the plaintiff's prima facie case carry distinct burdens of proof. *Id.*

The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a "but for" cause of the adverse employment decision. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct.

The standard for establishing the "causal link" element of the plaintiff's prima facie case is much less stringent.... A plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the "causal link" element of a prima facie case.

*Id.* (internal citations and quotations omitted).

**176.** *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir.2001) (quoting *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)).

**177.** *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir.2001).

**178.** *Burlington Northern & Santa Fe Ry.*, 126 S.Ct. at 2411.

**179.** *Id.* at 2414–15.

**180.** *Id.* at 2415 (internal quotations omitted).

**181.** *Id.* at 2415 (internal quotations omitted).

**182.** *Id.* at 2415.

**183.** *Id.* at 2415.

pend on the particular circumstances.[184] In short, "context matters." [185] Finally, the standard discussed above does not require a reviewing court or jury to consider the nature of the discrimination which led to the filing of retaliation charges.[186] "The standard is tied to the challenged retaliatory act, not the conduct that forms the basis of the Title VII complaint." [187]

### B. Whether Silva Has Established a Prima Facie Case of Unlawful Retaliation

#### 1. The Parties' Arguments

As previously stated, to establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he was subject to an adverse employment action; and (3) there is a causal link between the plaintiff's participation in the protected activity and the adverse employment action.[188] Here, Defendant argues that Silva has failed to establish the "causal-link" aspect of a prima facie retaliation claim. Defendant notes that Silva says he complained to two of his supervisors in October 2001, asserting they provided reasonable workplace accommodations to white workers, but not to him. Defendant does not dispute that Silva's alleged complaint to his supervisors represents an activity protected by Title VII, the ADEA, or the Rehabilitation Act. Defendant nonetheless observes the agency did not deny Silva a lateral transfer until an unspecified date in 2003, and did not terminate him until February 2004. Defendant contends the asserted causal link between Silva's protected activity and proffered adverse employment actions is too attenuated, especially when there is no evidence that Chief Patrol Agent Barker, the deciding official,

knew of Silva's complaint to his supervisors.

Silva responds by focusing only on the timing of Silva's EEOC Complaint, filed on July 3, 2003. Silva notes the agency offered him the LECA position again on July 10, 2003, although Silva had previously asked the agency to let him work in the El Paso electronics shop and, according to Silva, there was a position available there for him. The agency then proposed to terminate Silva on August 28, 2003, fewer than two months after Silva filed his EEOC Complaint. Citing *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir.2001), Silva asserts that the Fifth Circuit has found a time lapse of up to four months between the employee's protected activity and the alleged retaliatory conduct sufficient to satisfy the causal connection element for summary judgment purposes. The Court understands Silva to argue that the lapse of fewer than two months between the date Silva filed his EEOC charge and the agency's proposal to remove him by itself establishes the required causation element of a prima facie case.

Defendant replies that Silva is attempting to recharacterize his deposition testimony, wherein Silva testified that the first instance of his protected activity occurred in 2001, when Silva complained to his supervisors that they were not affording him the same treatment they extended to injured workers outside his Title VII protected class because they would not allow him to transfer to a permanent light-duty position in the El Paso shop. Further, Defendant contends, Silva is deliberately ignoring the fact that the agency first offered the Silva the LECA position on June 20, 2002, more than a year before the

184. *Id.* at 2415.

185. *Id.* at 2415.

186. *Id.* at 2415.

187. *Id.* at 2416.

188. *Mato,* 267 F.3d at 450.

agency offered Silva the LECA position for the third time on July 10, 2003. Lastly, Defendant argues, courts have rejected Silva's argument that temporal proximity between the employee's protected activity and the alleged retaliatory acts by itself is adequate to establish the requisite causal connection.

### 2. Discussion

█ The Parties' arguments center on the role temporal proximity (or the lack thereof) plays in establishing the requisite causal link element of a prima facie retaliation claim. After examining the applicable law, it is clear that the *lack* of temporal proximity between an employee's protected activities and his employer's alleged retaliatory conduct can support a finding that the proposed link between the events at issue is too attenuated to establish causality.[189] The length of time between Silva's comments to his supervisors and the agency's denial of his transfer request, or alternatively, his discharge is significantly lengthy and supports Defendant's argument that the interval is too attenuated to

establish a causal link.[190] The Court therefore finds Silva has failed to establish a prima facie case of retaliation to the extent he argues the agency retaliated against him for his October 2001 comments to his supervisors.

█ The Court next considers the roughly two-month interval between the date Silva filed his EEOC complaint and the date the agency issued its proposal to remove him from federal service. Whether, as Silva argues, a close temporal connection between the employee's protected activity and the employer's allegedly retaliatory actions *automatically* establishes the requisite link is unclear.[191] In an abundance of caution and mindful of its duty to do justice to the Parties, the Court concludes Silva has satisfied the forgiving standard for establishing the causation element of a prima facie retaliation claim in this limited respect.

█ However, the Court's conclusion regarding causation does not end the matter. Although the Court finds Silva has sufficiently stated a prima facie claim of

**189.** *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Raggs v. Miss. Pow:·· & Light Co.,* 278 F.3d 463, 471 (5th Cir.2002) (finding that a seven year interval between the employee's filing of an EEOC complaint and his termination and an intervening positive evaluation undermined the employee's claim of unlawful retaliation); *Mayberry,* 55 F.3d at 1092 (stopping short of finding that an adverse employment action occurring several years after the employee engaged in protected a Title VII activity represented evidence *against* a finding of retaliation, but concluding that, at a minimum, the evidence was clearly insufficient to support a finding that, but for engaging in the protected activity, the employer would not have suspended the employee).

**190.** *See Breeden,* 532 U.S. at 274, 121 S.Ct. 1508; *Raggs v,* 278 F.3d at 471; *Mayberry,* 55 F.3d at 1092.

**191.** *See Jones v. Robinson Prop. Group, L.P.,* 427 F.3d 987, 995 (5th Cir.2005) ("We have noted that a time period of four months is sufficient to demonstrate a causal link for summary judgment purposes ... therefore, surely the less than 60 day period that elapsed here between the protected activity and an adverse action would have been sufficient for [the plaintiff] to demonstrate a causal connection, and survive summary judgment."); *contra Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 655 (5th Cir.2004) (citing *Swanson v. GSA,* 110 F.3d 1180, 1188 n. 3 (5th Cir.1997) for the proposition that "we have made clear that 'the mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a prima facie case' "); *Raggs,* 278 F.3d at 471 (citing *Swanson,* 110 F.3d at 1188 n. 3 for the same proposition).

retaliation prohibited by Title VII, the agency has come forward with a legitimate, non-discriminatory reason for denying Silva the requested transfer and for ultimately discharging him. Silva must now persuade the fact finder at trial that, "but for" his filing an EEOC complaint, the agency would not have issued its proposal to remove him or ultimately discharged him.[192] To survive Defendant's motion for summary judgment, Silva's evidence in this regard must be sufficient to allow a reasonable jury to return a verdict in his favor.[193] Merely colorable or not significantly probative evidence will not suffice.[194] After examining Silva's evidence, the Court finds it falls far short of the mark.

Silva provides no evidence whatsoever that Chief Barker, the decision maker, acted from any retaliatory animus. The only evidence directly on this point is Barker's statement, under oath, that he had not been aware of Silva's prior protected activity before the EEOC initiated its investigation into Silva's EEOC complaint and that he addressed Silva's situation in the same manner he handled those of other agency employees in similar circumstances.[195] Further, the evidence shows that the agency, through Barker or his designates, offered Silva alternative employment in the El Paso Sector in the form of a LECA position on three separate occasions.[196] The agency's offer included accommodations for Silva's permanent physical restrictions. In addition, Silva would have experienced no decrease in pay or benefits if he had accepted the LECA position. Moreover, Barker held his proposal to remove Silva from federal service in abeyance at Silva's request so Silva could file for disability retirement. Barker's signature on various letters detailing Silva's physical restrictions and advising Silva that the agency had no permanent light-duty Electronics Technician positions is strong evidence that Barker believed the statements in the letters to be true and that these beliefs motivated him to discharge Silva when Silva repeatedly refused the LECA position and did not diligently pursue disability retirement.[197] Moreover, although Silva vigorously argues the agency had permanent light-duty positions, he has presented no evidence to show that any such permanent positions existed. At most, Silva has shown the agency was, for limited periods, able to accommodate workers who could temporarily not perform the full range of duties associated with their positions.

192. *Long,* 88 F.3d at 305 n. 4.

193. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

194. *Id.*

195. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 27 (Excerpts from EEOC Rep't on Investigation) at 23–24.

196. On July 10, 2003, Silva informed the agency in writing that he wanted it to restrict a job search on his behalf to the El Paso Border Patrol Sector because he had no desire to transfer to another duty location outside the El Paso sector. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 16 (Silva's executed July 10, 2003 Relinquishment of Agency–Wide Job Search). In his deposition, Silva stated that he did not see any reason to leave El Paso because, in his opinion, the agency had jobs in El Paso. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 2 (Silva Depo.) at 101.

197. *See Little,* 924 F.2d at 97 (stating that, even if the plaintiff was factually correct about the adequacy of his own job performance, the fact that the plaintiff's former supervisor at one time believed that contrary statements in the plaintiff's performance evaluation were true and worthy of the former supervisor's signature was strong evidence that plaintiff's newly-assigned supervisor believed the former supervisor's statements and was motivated by them).

Further, in response to the EEOC's investigation, Joseph A. Maurer, a Border Patrol labor and employee relations specialist, compiled a list of El Paso Sector employees the agency terminated during the period of January 2002 to February 2004 for inability to perform their position's full range of duties.[198] Maurer stated the agency terminated only two employees during that period for their inability to perform the full range of their duties, one of whom was Silva.[199] The other employee was a Border Patrol agent of non-Hispanic origin, born on September 27, 1964.[200]

Maurer further stated he was aware the agency had made a proposal of removal against a third individual on January 2, 2003, based on the employee's inability to perform a full range of job duties.[201] The employee, who was of non-Hispanic origin and born on August 26, 1953, suffered an on-the-job injury.[202] His doctor imposed permanent restrictions which disqualified the individual from performing his duties as an Electronics Technician.[203] The worker chose to file for disability retirement and medically retired on May 21, 2003.[204]

Maurer also noted Silva had identified four employees from the Electronics Technician Branch in his EEOC actions and alleged the agency gave them temporary or permanent light-duty assignments upon request due to on-the-job injuries.[205] Maurer asserted he had reviewed these employees' personnel and verified that only one of them, the non-Hispanic male mentioned in the previous paragraph, had been subject to permanent medical restrictions.[206] As noted, the worker medically retired before the agency issued a final decision on its proposal to remove him from federal service.[207] Of the other three employees, Maurer reported, two were non-Hispanic and one was Hispanic.[208] Maurer gave their dates of birth as October 18, 1964, October 10, 1956, and June 24, 1959.[209] Their supervisors were variously Albert Woo, Narciso Retana, David Turner, and Andres Batista.[210] Maurer declared that all three of these employees suffered only temporary injuries and returned to full duty without medical restrictions.[211] In addition, the agency gave none of these individuals permanent light-duty assignments.[212]

After due consideration, the Court concludes that no reasonable jury could find that the agency retaliated against Silva for filing his EEOC Complaint. The Court will accordingly grant Defendant's motion for summary judgment as to Silva's retaliation claim.

## IV. CONCLUSION AND ORDER

For the reasons discussed above, the Court finds that it should overrule Defen-

198. Def.'s Mot. to Dismiss, Rec. No. 22, Ex. 33 (Maurer Decl.) at ¶ 3.

199. Id.

200. Id.

201. Id. at ¶ 4.

202. Id.

203. Id.

204. Id.

205. Id.

206. Id. at ¶ 5.

207. Id. at ¶ 4.

208. Id. at ¶ 5.

209. Id.

210. Id.

211. Id.

212. Id.

dant's Objections in part and sustain them in part, as set forth in Part III, *supra,* of this Memorandum Opinion and Order. The Court further concludes it should grant Defendant's Motion in its entirety.

The Court according enters the following orders:

1. Defendant Michael Chertoff's "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" [Rec. No. 22] is hereby **GRANTED.**

2. The Court accordingly **DISMISSES** Plaintiff Frank G. Silva's "Original Complaint" [Rec. No. 1] **WITH PREJUDICE.**

3. All pending motions in this cause, if any, are **DENIED AS MOOT.**

**SO ORDERED.**